**Martin FOX, Plaintiff-Appellant,**

v.

**REICH & TANG, INC. and Daily Income Fund, Inc., Defendants-Appellees.**

**No. 74, Docket 82–7296.**

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1982.

Decided Oct. 26, 1982.

Certiorari Granted March 7, 1983. See 103 S.Ct. 1271.

---

Richard M. Meyer, New York City (Milberg, Weiss, Bershad & Specthrie, New York City, of counsel), for plaintiff-appellant.

Daniel A. Pollack, New York City (Pollack & Kaminsky, Frederick P. Schaffer, New York City, of counsel), for defendant-appellee Daily Income Fund, Inc.

Seward & Kissel, New York City (Anthony R. Mansfield, New York City, of counsel), for defendant-appellee Reich & Tang, Inc.

Before FEINBERG, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This case presents an issue of first impression in this Circuit. The question before us is whether, in a shareholder action brought pursuant to § 36(b) of the Investment Company Act of 1940 to recover allegedly excessive fees paid by an investment company to its adviser,[1] the shareholder plaintiff is required to plead that a "demand" was made on the company's board of directors prior to filing of the complaint.[2] At first blush, resolution of this question would seem to require merely clarification of a technical pleading rule. As our discussion makes clear, however, analysis of the issue is not uncomplicated, nor is our conclusion without important ramifications for suits brought pursuant to § 36(b).

I

Because this case comes to us from a dismissal at the pleading stage, the factual record is sparse. Martin Fox, a shareholder of Daily Income Fund, Inc. ("the Fund"), brought this action on behalf of the Fund to recover allegedly excessive fees paid by the Fund to its investment adviser, Reich & Tang, Inc. ("R & T"). The Fund, an open-end investment company of the type commonly referred to as a "money-market fund," pursues as its basic business strategy the goal of achieving high current income levels while preserving capital. To this end, it invests in a portfolio of short-term money market instruments, principally United States government and federal agency obligations, obligations of major banks, and prime commercial paper. The Fund experienced a dramatic surge in its assets, in a relatively short period of time. As of June 30, 1978, the Fund's net assets were approximately $75 million. Less than three years later, on April 15, 1981, they had reached a level of $775,000,000. Precisely this sort of "dramatic growth"[3] impelled enactment of the 1970 amendments to the Investment Company Act of 1940, and, in particular, § 36(b), which created a cause of action for return of excessive adviser fees. Because fees are usually calculated as a percentage of assets, substantial portfolio appreciation brings with it the risk of unduly high adviser compensation. See S.Rep. No. 184, 91st Cong., 1st Sess. 6 (1969), reprinted in 1970 U.S.Code Cong. & Ad.News at 4902; see also J. Barnard, Jr., Reciprocal Business, Sales Charges and Management Fees, in 1966 Fed. B.A. Conference on Mutual Funds 127–29.

Despite this substantial increase in Fund assets, no adjustment was made in the rate

---

1. Section 36(b) imposes upon the investment adviser of a registered investment company "a fiduciary duty with respect to the receipt of compensation for services." 15 U.S.C. § 80a–35(b). It creates a cause of action for breach of that duty, id., and specifically limits "[a]ny award of damages ... to the actual damages resulting from the breach of fiduciary duty[,] ... in no event exceed[ing] the amount of compensation or payments received from [the] investment company...." The legislative history reveals that Congress created this somewhat particularized fiduciary duty with specific reference to the recurring problem of payment of excessive adviser and management fees, e.g., S.Rep. No. 184, 91st Cong., 1st Sess. 5–6 (1969), reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4901–02.

2. This pleading requirement in the federal courts is embodied in Federal Rule of Civil Procedure 23.1, the text of which is set out at note 6.

3. S.Rep. No. 184, 91st Cong., 1st Sess. 3 (1969), reprinted in 1970 U.S.Code Cong. & Ad.News at 4899. After passage of the Investment Company Act of 1940, the industry experienced a period of relative stability. During the first year 436 companies registered, pursuant to the Act. At the end of fiscal year 1959, the number of companies had increased to only 453 with aggregate assets of about $20,000,000,000. By 1966, just seven years later, 727 companies were registered, representing assets of nearly $50 billion. 1966 SEC Ann.Rep. 100. Not surprisingly, that same year Congress requested the Securities and Exchange Commission to investigate this matter. The SEC's findings, and recommendations for legislative action are contained in Report on the Public Policy Implications of Investment Company Growth, reprinted in H.R.Rep. No. 2337, 89th Cong., 2d Sess. (1966) ("1966 SEC Report").

at which R & T was to be paid for investment advice and other management services rendered. R & T's fee was originally set at one-half of one percent of the Fund's net assets, and it remains fixed at that rate. Consequently, yearly payments by the Fund to its adviser increased from approximately $375,000 in 1978, to a projected $3,875,000 in 1981. During the fiscal year ending June 30, 1980, R & T received more than $2,000,000 in management fees from the Fund. It is this extraordinary leap in fees of which Fox complains.

Fox's complaint alleged that management of the assets of a money market fund requires no detailed analysis of industries (or of large individual industrial concerns), nor the retention of a large staff of highly paid, sophisticated securities analysts. Essentially, he claimed that investment decisions are more or less routine, concentrated as they are in the relatively limited realm of "turning over" money market investments with a small number of institutions. In short, Fox alleged that R & T was continuing to provide the services it had always rendered, for what had become an exorbitant amount of money.

Rather than approach the Fund's directors with his grievance, Fox chose to allege in his complaint that no "demand" is required under § 36(b).[4] In response, the Fund (later joined by R & T) moved to dismiss for failure to comply with Rule 23.1. After noting that the issue had resulted in a split among the district courts in this Circuit,[5] Judge Duffy concluded that a Rule 23.1 demand was required in a § 36(b) suit, and dismissed the complaint. Fox appealed. For the reasons stated below, we disagree with the district court's conclusion, 94 F.R.D. 94, and reverse.

## II

We begin by noting that the Rule 23.1 demand requirement applies only when a corporation or association has "failed to enforce a right which may properly be asserted by it."[6] We agree with Fox that the

**4.** Fox's complaint asserted, in addition to this legal conclusion, that "all of the [Fund's] directors are beholden to R & T for their positions and have participated in the wrongs complained of in this action. Their initiation of an action like the instant one would place the prosecution of this action in the hands of persons hostile to its success." Apparently by way of response, the Fund notes that a majority of its Board of Directors, three of five, are "disinterested directors." We need not deal with the effect of these statements. Some courts have held demand will be excused when a plaintiff shows that a majority of the investment company's directors possess an interest in the subject matter of the lawsuit sufficient to conclude that it would have been futile to ask for board action. *E.g., Markowitz v. Brody,* 90 F.R.D. 542, 556 (S.D.N.Y.1981). Yet, the mere presence of a majority of directors not directly employed by the adviser may not automatically result in the conclusion that a demand will be required. *See Lewis v. Curtis,* 671 F.2d 779, 785–86 (3d Cir. 1982). Because we agree with Fox that a § 36(b) action is exempt from the director demand requirement of Rule 23.1, we do not pass on the excuse issue.

**5.** Indeed, the conflict between previous district court cases could not be more stark. In *Markowitz v. Brody, supra,* 90 F.R.D. at 554–55, Judge Ward concluded that Rule 23.1 applies to § 36(b) shareholder suits. *Accord, Gartenberg v. Merrill Lynch Asset Management, Inc.,* 91

F.R.D. 524, 526–28 (S.D.N.Y.1981). In direct contrast, Judge Lasker has stated: "a demand on the directors of the fund was not intended to be a prerequisite to suit under § 36(b)." *Blatt v. Dean Witter Reynolds Intercapital, Inc.,* 528 F.Supp. 1152, 1155 (S.D.N.Y.1982) (dictum). *Cf. Boyko v. Reserve Fund, Inc.,* 68 F.R.D. 692, 696 (S.D.N.Y.1975) (Gagliardi, J.) (when at least one affiliated or interested director on mutual fund board, futility of demand will be presumed, and, therefore, Rule 23.1 will be satisfied).

**6.** Fed.R.Civ.P. 23.1 provides, in its entirety:

Derivative Actions by Shareholders

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if nec-

rule applies only when the specified entity has an opportunity to "assert," in a court, the same action under the same rule of law on which the shareholder plaintiff relies. Thus, if the Fund may not sue pursuant to § 36(b), no demand upon its board of directors will be required. In rejecting the Fund's argument that even if it cannot bring an action under § 36(b), a demand must be made upon its directors to utilize other, informal means to "enforce its right" to return of excessive adviser fees, Brief of Defendant-Appellee Daily Income Fund, Inc. at 5–6,[7] we announce no new rule of law. As long ago as the beginning of this century, the Supreme Court construed Equity Rule 94, 104 U.S. ix (1882), the precursor of Rule 23.1, and determined that its nearly identical language[8] referred to "a suit founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff." *Delaware & Hudson Co. v. Albany & Susq.*

*R.R.,* 213 U.S. 435, 447, 29 S.Ct. 540, 543, 53 L.Ed. 862 (1909); *see also Ross v. Bernhard,* 396 U.S. 531, 534–35, 90 S.Ct. 733, 735–736, 24 L.Ed.2d 729 (1970).

Accordingly, we turn initially to the question whether an investment company can bring an action under § 36(b) of the Investment Company Act of 1940.

## A

■ Our starting point, as in every case involving construction of a statute, is examination of the language utilized by Congress. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). The second sentence of § 36(b) is quite clear that an action may be brought under that subsection only "by the [Securities and Exchange] Commission, or by a security holder of [a] registered investment company on behalf of such company."[9] No

---

essary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

**7.** As indicated, we disagree that availability of informal methods of attempting to recoup excessive adviser fees is sufficient to trigger the demand requirement of Rule 23.1. Moreover, we find the examples given by the Fund—negotiating with the Adviser to obtain a refund, and terminating the contract, Brief for Defendant-Appellee Daily Income Fund, Inc. at 5–6—not persuasive. Negotiations may well fail, and termination of the contract, although perhaps depriving the adviser of future business, may not effect the remedy sought by the shareholder plaintiff, which is the return of excessive fees. Additionally, "a mutual fund cannot, as a practical matter sever its relationship with [its] adviser." S.Rep. 184, 91st Cong., 1st Sess. 5 (1969), *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4901. Moreover, given the directors' past relationship with the adviser in approving the contract in the first place, 15 U.S.C. § 80a–15(c), the likelihood that negotiations will prove effective is highly speculative.

*See Blatt v. Dean Witter Reynolds Intercapital, Inc., supra,* 528 F.Supp. at 1156 (dictum). In reaching this conclusion, we do not ignore the salutary purpose served by requiring complaining shareholders to first "activate intracorporate remedies," *Mills v. Esmark, Inc.,* 91 F.R.D. 70, 72 (N.D.Ill.1981). Rather we conclude that a demand will not be mandated unless, should intracorporate efforts prove insufficient, the corporation itself may bring suit. *Id.* (quoting *Hawes v. Oakland,* 104 U.S. 450, 460–61, 26 L.Ed. 827 (1882)).

**8.** Equity Rule 94 provided, in relevant part:
Every bill brought by one or more stockholders in a corporation against the corporation and other parties *founded upon the rights which may properly be asserted by the corporation* ... must ... set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors ....
Eq.R. 94, 104 U.S. ix (1882) (emphasis added).

**9.** The full text of § 36(b) is as follows:
15 U.S.C. § 80a–35. Breach of fiduciary duty

\* \* \* \* \* \*

(b) For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An ac-

action by the investment company is authorized. When Congress has provided specific and elaborate enforcement provisions, and entrusted their use to particular parties, we will not lightly assume an unexpressed intention to create additional ones. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 13–15, 101 S.Ct. 2615, 2622–2624, 69 L.Ed.2d 435 (1981).

Appellee points to the words "on behalf of such company," and argues they demonstrate that the right of the shareholder created by § 36(b) is derivative, and therefore the director demand requirement of Rule 23.1 applies, as it does to other "derivative" actions in the federal courts.

▇ The words "on behalf of" do not create by implication a statutory right of the company itself to sue, from which the stockholders' right may be said to be "derivative." These words, which apply as much to the Securities and Exchange Commission as to a private security holder, signify only that either party so entitled to bring an action under § 36(b) must do so to seek return of excessive management fees to the company treasury and not to individual or governmental coffers. The action is not, strictly speaking, "derivative" in the sense of deriving from a right properly asserted by the corporation, but rather constitutes individual security holders as "private attorneys general" to assist in the enforcement of a duty imposed by the statute on investment advisers.

We recognize that the one Court of Appeals to have considered the question reached a different conclusion. *Grossman v. Johnson,* 674 F.2d 115 (1st Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982). In rejecting the argument that because § 36(b) explicitly provides for, it therefore only permits, suit by the SEC or a security holder, the First Circuit stated:

> We cannot believe, however, that, for example, a new and independent board of directors, intent on recovering excessive fees from an investment adviser, would

tion may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:

(1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.

(2) In any such action approval by the board of directors of such investment company of such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.

(3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payments received from such investment company, or the security holders thereof, by such recipient.

(4) This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a–17 of this title, or rules, regulations, or orders thereunder, or to sales loans for the acquisition of any security issued by a registered investment company.

(5) Any action pursuant to this subsection may be brought only in an appropriate district court of the United States.

(6) No finding by a court with respect to a breach of fiduciary duty under this subsection shall be made a basis (A) for a finding of a violation of this subchapter for the purposes of sections 80a–9 and 80a–48 of this title, section 78o of this title, or section 80b–3 of this title, or (B) for an injunction to prohibit any person from serving in any of the capacities enumerated in subsection (a) of this section.

be precluded from suing under section 36(b).

*Id.* at 120. Equally cogent is our belief that this situation was regarded as so remote or unlikely that the legislature chose not to provide for it, and was wary of permitting the Fund to control the suit, *see Burks v. Lasker,* 441 U.S. 471, 483–84, 99 S.Ct. 1831, 1839–1840, 60 L.Ed.2d 404 (1979). Moreover, the *Grossman* court offers scant support for its conclusion that the Fund may sue. It refers, first, to the "on behalf of" language in the statute. We have already indicated the meaning we attach to that phrase. Similarly, we are unpersuaded by the argument that "Congress could well have believed that, though it was appropriate to specify that the Commission and shareholders had the new statutory cause of action[,] . . . it was unnecessary to say with particularity that the company also did." *Id.* This seems totally inconsistent with what we would expect Congress to have done. If Congress had intended to provide the company with a cause of action, it would have passed a statute saying so, in which case the derivative right of a shareholder to initiate suit would have followed automatically. A mere statement of what Congress "could have believed" seems to us not enough. Congress has not expressed, anywhere at all, the policy appellee would have us adopt.

Moreover, as the First Circuit itself notes, § 36(b)(3) "directly forbids" an action against any person "other than the recipient of . . . compensation or payments [for adviser services]." Yet, the opinion relies on the proceeding in that case having been brought against "forbidden" defendants (the "disinterested" directors and the Fund itself) as support for its conclusion that a § 36(b) suit is a typical derivative suit. The idea, apparently, is that Grossman was operating under the assumption that a § 36(b) action is the standard derivative action, in which the complaining shareholder would join the company and its directors, "in the ordinary fashion," after the corpora-

tion had declined to initiate the suit as a plaintiff. *See* H. Henn, *Handbook of the Law of Corporations and Other Business Enterprises* § 358 at 750 (2d ed. 1970). It is difficult to understand how a defect in a pleading—or a misreading of § 36(b)—can take precedence over the clear dictates of a statute.

■ The language of a statute controls when sufficiently clear in its context. *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 201, 96 S.Ct. at 1384. Nevertheless, mindful of our obligation to supplement application of rules of statutory construction by searching for "persuasive evidence of a contrary legislative intent," *Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* 444 U.S. 11 at 21, 100 S.Ct. 242 at 247, 62 L.Ed.2d 146 we move now to an examination of the legislative history of § 36(b).

### B

Prior to enactment of the Investment Company Act of 1940, open-end investment companies,[10] or mutual funds, played a minor role in the world of finance. In 1940, investment companies held assets of approximately $2.1 billion; of this sum, mutual funds accounted for $450 million. *1966 SEC Report 2.* The 1940 Act was directed at the most flagrant self-dealing and other abuses within the investment company industry. *See United States v. Deutsch,* 451 F.2d 98, 108 (2d Cir.1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972). It prohibits, for example, most transactions between investment companies and their advisers. 15 U.S.C. § 80a–17. Generally, the Act requires at least forty percent of a fund's board of directors to be "unaffiliated" with the adviser, and it mandates that payment for management and other investment advice be the subject of a contract between the fund and the adviser which has received both shareholder and director approval, 15 U.S.C. § 80a–15(a), (c). Moreover, a duty is imposed on the directors of a fund to evaluate the terms of the adviser contract. 15 U.S.C. 80a–15(c).

---

**10.** An "open-end" company is one which continually offers shares for sale and will redeem outstanding shares at their proportionate net asset value. 15 U.S.C. § 80a–5(a)(1).

The 1940 Act proved most successful in controlling the serious problems covered by its broad brush approach. Indeed, an ironic measure of its success has been the public's growing confidence in the investment company industry, which led to a period of extraordinary growth in the number of investors and in net asset levels of the funds. In turn, this expansion created a specific and largely unforeseen problem. Because adviser fees are usually calculated at a percentage of a fund's net assets, and vary in proportion as portfolio value goes up or down, a period of sustained industry success would—and did—yield substantially increased fees. But the Act "did not provide any mechanism by which the fairness of management contracts could be tested in court." S.Rep. No. 184, 91st Cong., 1st Sess. 5 (1969), *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4901.

What the drafters of the 1940 Act *did* foresee, in a general way, was the possibility that the future success of the industry might entail the need for statutory change. As a result, a section of the original statute provided (and still states) that the SEC may study the ramifications of "any substantial further increase in size of investment companies ... involving the protection of investors or the public interest," and present recommendations for legislative change. 15 U.S.C. § 80a–14(b). Accordingly, in 1958, the Commission authorized the securities research unit of the Wharton School of Finance and Commerce of the University of Pennsylvania to study investment companies and report its findings. The Wharton Report identified the salient issues, but made no proposals. Subsequently, the Commission undertook further research, and presented the results and recommendations for detailed amending legislation in its *Report on the Public Policy Implications of Investment Company Growth,* transmitted to Congress in 1966.

The *1966 SEC Report* reiterated the Wharton unit's findings. It concluded that management fees tended to be fixed at the traditional level of one-half of one percent of the fund's net assets. It noted that they markedly exceeded fees charged by invest-

ment advisers to other institutional clients and the cost of management to those funds which manage themselves. Moreover, no evidence existed to demonstrate a willingness on the part of the advisers to provide services at a "reasonable" rate, not necessarily a percentage of assets. The Report further stated that the 1940 Act was not equipped to deal with this emerging problem, and that shareholder suits, although occasionally forcing settlements, basically had been ineffective. *1966 SEC Report* 84–149. To deal with this issue, the SEC recommended amending the Act to require that management fees be "reasonable." Reasonableness was to be determined by reference to various criteria, including the fees paid for similar services by like institutions, the nature and quality of services rendered, and any other factors determined to be appropriate in the public interest. The SEC was to have an enforcement action available to it (as in fact it does under present § 36(b)), and would also possess the right to intervene in private shareholder suits. *Id.* at 143–47. Nowhere does the Report mention an action brought by the investment company itself.

The standard of "reasonableness" proposed in the *1966 SEC Report* was contained in the first bills considered by Congress, H.R.9510, 90th Cong., 1st Sess. § 8(d) (1967) and S.1659, 90th Cong., 1st Sess. § 8(d) (1967). Not surprisingly, it was met by vigorous industry opposition, *see generally Hearings on S.1659 Before the Senate Comm. on Banking and Currency,* 90th Cong., 1st Sess., pt. 1, at 191–201 *("1967 Senate Hearings"); Investment Company Act Amendments of 1967: Hearings on H.R.9510, H.R.9511 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce,* 90th Cong., 1st Sess., ser. 90–21, pt. 1, at 237–43 (1967) (statement of John R. Haire, chairman-elect, Investment Company Institute), and neither bill passed. The industry claimed fees were already reasonable, the legislation would encourage "strike" suits, and the SEC would be empowered to regulate a competitive industry.

*1967 Senate Hearings* at 191–92, 202. In one sense, of course, the relative merits of each side of this debate are irrelevant. The ultimate passage of § 36(b) settled the issue and expressed the legislative conclusion that imposing a "fiduciary duty" and leaving its exegesis to the judiciary [11] provided the best solution. This decision represented the compromise reached by industry representatives and the SEC. *See Hearings on H.R.11995, S.2224, H.R.13754, H.R.14737 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce,* 91st Cong., 1st Sess., ser. 91–33, pt. 1, at 138 (1969) *("1969 House Hearings").* On the other hand, that the focus of legislative inquiry, from the introduction of the first bills through a period of several years until enactment, remained fixed on this question, is of special significance for our purpose. The normal conclusion to be drawn from intensive—and exclusive—Congressional scrutiny of a particular subject is that Congress did not concern itself with others. Put differently, if the voluminous legislative history of § 36(b) and its unsuccessful predecessors persuades us that Congress's first order of business was how to make shareholder suits (and SEC enforcement actions) effective, rather than whether it might also be useful to sanction suit by a fund, we would be hard-pressed to conclude that Congress intended to empower the courts to permit a fund to sue.

It is obviously difficult, under the best of circumstances, to prove a negative. Because the extensive legislative history of § 36(b) neither approves nor disapproves suits brought directly by mutual funds, it cannot be shown to a certainty (and perhaps never to the satisfaction of those dis-posed to believe otherwise) that Congress foreclosed their use of the section. What *can* be shown, in this instance, is that the Congressional approach to a specific problem—excessive adviser fees—consisted of, first, identifying the source of that problem; next, determining why the 1940 Act, in other respects effective, had been and would continue to be incapable of remedying it; and finally, amending the relevant portion of the Act. If, therefore, the source of the problem is inconsistent with a corporate right of action as a solution, we can say with confidence that Congress never intended to create one. Moreover, if the flaw in the 1940 Act was unrelated to the unavailability of a suit by the fund, our conclusion becomes virtually certain, since we know that the statutory lacuna was filled by a provision conspicuous for its failure to name the fund as a potential plaintiff.

Several years of careful study indicated that the problem derived from the peculiar nature of the mutual fund industry (seen in light of its rapid growth):

> Mutual funds, with rare exceptions, are not operated by their own employees. Most funds are formed, sold, and managed by external organizations, that are separately owned and operated. These separate organizations are usually called investment advisers. The advisers select the funds' investments and operate their businesses. For these services they receive management or advisory fees. These fees are usually calculated at a percentage of the funds' net assets and fluctuate with the value of the funds' portfolio.

11. *E.g.,* 15 U.S.C. § 80a–35(b)(2); *see 1967 Senate Hearings* at 1016:

> It is for Congress to decide in each case just what mix of administrative and judicial participation is best adapted to the problem in hand. One end of the spectrum provides more in administrative expertise and uniformity, the other more in those qualities of restraint, freedom from bureaucratic rigidity, open-mindedness and good sense that judges like to believe are special attributes of courts.
>
> (Statement of Judge Henry J. Friendly)

The quoted language goes to the question whether case-by-case judicial evaluation of allegations of excessive adviser fees, on the one hand, or an administrative procedure which would also weigh industry-wide factors, on the other, is best suited to adjudication of shareholder complaints. Congress apparently believed, along with my brother Friendly, that courts possessed sufficient good qualities to make them appropriate forums in which § 36(b) complaints might be heard.

Because of the unique structure of this industry the relationship between mutual funds and their investment adviser is not the same as that usually existing between buyers and sellers or in conventional corporate relationships. Since a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

\* \* \* \* \* \*

It is noted ... that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

S.Rep. No. 184, 91st Cong., 1st Sess. 5–6 (1969), *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4901–02; *see also 1966 SEC Report* 131; H.R.Rep. No. 1382, 91st Cong., 2d Sess. 7 (1970); *Galfand v. Chestnutt Corp.,* 545 F.2d 807, 808 (2d Cir. 1976).

Additionally, the requirement that a percentage of the directors of the investment company be "independent" of the adviser and underwriter, 15 U.S.C. § 80a–10, and that they annually approve the adviser contract, 15 U.S.C. § 80a–15, cannot seriously be expected to induce arm's-length bargaining. As the SEC long ago recognized, any so-called independent directors would "obviously have to be satisfactory to the dominating stockholders who are in a position to continue to elect a responsive board." *Petroleum & Trading Corp.,* 11 S.E.C. 389, 393 (1942); *see 1969 House Hearings,* ser. 90–22 at 696–97 (testimony of SEC Chairman Manuel F. Cohen).

In sum, the root of the excessive adviser fee problem is basically incompatible with a corporate right of action as an effective solution. We believe the Senate Committee on Banking and Currency (referring to the bill eventually passed) had in mind exactly the plaintiffs it named and no others when it stated: "[Y]our committee has adopted the basic principle that, in view of the potential conflicts of interest involved in the setting of [adviser] fees, there should be effective means for the court to act where mutual fund shareholders or the SEC believe there has been a breach of fiduciary duty." S.Rep. No. 184, 91st Cong., 1st Sess. 1 (1969), *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4898. Neither the parties' briefs nor our own research has disclosed any indication in the comprehensive legislative history of § 36(b) that suits by directors themselves were to be expected or encouraged. Although we agree with Judge Duffy that Congress intended the directors would perform a "watchdog" function, *see also Burks v. Lasker, supra,* 441 U.S. at 484, 99 S.Ct. at 1840; *Boyko v. Reserve Fund, Inc., supra,* 68 F.R.D. at 695–96 n. 2, it defies logic to conclude their contemplated role included suing their advisers.

Moreover, the 1940 Act was not deficient or ineffective because a fund could not use it. By the time consideration of the 1970 Amendments was at hand, it had become clear that shareholders were hard pressed to prove a "gross abuse of trust," the standard of old § 36. *Saxe v. Brady,* 40 Del.Ch. 474, 184 A.2d 602 (1962) (Seitz, Ch.), decided under traditional corporate law concepts, provided the model adhered to by federal courts in suits alleging excessive management fees. *See Kurach v. Weissman,* 49 F.R.D. 304, 305–06 (S.D.N.Y.1970). In *Saxe,* mutual fund shareholders challenged adviser fees amounting to one-half of one percent of net assets. The adviser contract had been approved almost unanimously by the shareholders. Chancellor Seitz (now Chief Judge of the Third Circuit Court of Appeals) concluded that the adviser fee level must be evaluated according to the usual

legal rules applicable to shareholder ratification cases:

> When the stockholders ratify a transaction, the interested parties are relieved of the burden of proving the fairness of the transaction. The burden then falls on the objecting stockholders to convince the court that no person of ordinary, sound business judgment would be expected to entertain the view that the consideration was a fair exchange for the value which was given.

*Saxe v. Brady, supra,* 40 Del.Ch. at 486, 184 A.2d at 610. In concluding that plaintiffs must show "actual waste," or a fee level so high as to be "unconscionable," *id.,* the Chancellor noted that a 0.5% adviser fee rate was common and that the shareholders had approved the adviser contract virtually unanimously. *Id.* at 489, 184 A.2d at 611–12. Since these determinative factors were inevitably present, showing "actual waste" and overcoming a presumption of "sound business judgment" was well nigh impossible. *Kurach v. Weissman, supra,* 49 F.R.D. at 305–06; *Goodman v. Von Der Heyde,* [1969–1970 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,541 (S.D.N.Y.1969); *Lessac v. Television-Elecs. Fund,* [1967–1969 Transfer Binder] Fed.Sec.L.Rep. ¶ 92,305 (S.D.N.Y. 1968); *see Rosenfeld v. Black,* 445 F.2d 1337, 1345–46 (2d Cir.1971). Recognizing that shareholder plaintiffs had difficulty sustaining their burdens, Congress changed only the standard of duty. *Cf. Burks v. Lasker, supra,* 441 U.S. at 483–84, 99 S.Ct. at 1839–1840 (1979).

Despite the long odds, shareholders did sue for return of allegedly excessive fees. Starting in 1959, over fifty suits were instituted under common law principles and pursuant to the 1940 Act. *1966 SEC Report* 132. What happened is instructive. Advisers were sometimes willing to settle, because even *Saxe* left open the possibility that the point might be reached at which "profits . . . outstripp[ed] any reasonable relationship to expenses and effort even in a legal sense." 40 Del.Ch. at 498, 184 A.2d at 616–17. Given the substantial sums at stake, this willingness is not surprising. For precisely the opposite reason—that is,

the slim likelihood of success on the merits—courts felt constrained to approve settlements, even when the terms were something less than desirable. *E.g., Kurach v. Weissman, supra,* 49 F.R.D. at 305. This confluence of inconsistent, but complementary, motives resulted in reduction of adviser fees in individual cases, but the effect on the industry as a whole was insignificant. In 1967, SEC Chairman Manuel Cohen noted that "[t]he median advisory fee paid by the 59 externally managed mutual funds with net assets of $100 million or more in fiscal years ending in 1966 was still 0.48 percent, down only 0.02 percent from the traditional 0.50 percent rate." *1967 Senate Hearings,* pt. 1, at 14–15. Obviously the pressure to settle was analytically unrelated to the identity of the plaintiff.

Our retracing of the analysis employed by Congress, and of its extensive documentation, persuades us that an investment company was not intended to possess a right of action under § 36(b). The relationship of a Fund to its adviser makes it a part of the problem in a way that precludes it from being part of the solution, at least at the litigation stage. The provision for evaluation of the adviser contract, 15 U.S.C. § 80a–15(c), and the general tightening of the powers of disinterested directors, *e.g.,* 15 U.S.C. §§ 80a–2(a)(19); 80a–10(a); 80a–15(c), provide for "an independent check on management . . . and the representation of shareholder interests in investment company affairs," S.Rep. No. 184, 91st Cong., 1st Sess. 32 (1969), *reprinted in* 1970 U.S.Code Cong. & Ad.News at 4927. We take this language to be nothing more nor less than a declaration by Congress that it was imposing duties on the directors to run the ongoing business of the Fund in a responsible manner, and with due regard for investors. *Cf. United States v. National Ass'n of Sec. Dealers,* 422 U.S. 694, 705 n. 13, 95 S.Ct., 2427, 2436 n. 13, 45 L.Ed.2d 486 (1975) (1940 Act concerned with imposing controls on "internal management [and] practices of investment companies"). These functions and duties having proved ineffective in a particular case, at least in the eyes of the

complaining shareholder plaintiff, the issue for Congressional scrutiny was how to particularize the already existing statute to make judicial relief a genuine possibility. Experience with shareholder suits had demonstrated that the *Saxe* standard, drawn from pre-existing corporate law principles but applied to the investment company industry, was useless. The fiduciary duty standard was imposed, and courts were empowered to view "all the circumstances," 15 U.S.C. § 80a–35(b)(2). The extensive number of suits brought under the earlier, less favorable law suggested that shareholders would move with alacrity pursuant to the new one. Given the nature of the problem and reasons for the 1940 Act's failure to remedy it, creating a corporate right of action would have made little sense and we conclude Congress never intended to do so.[12]

### III

We have not as yet considered the applicability of Rule 23.1 head-on. Instead, we posed the analytically precedent question, whether a Fund may use § 36(b), and thereby trigger the rule. Our answer, that Rule 23.1 does not apply because the Fund has no right of action, renders superfluous any extensive discussion of the policy behind requiring demand. Nonetheless, because we believe neither policy nor logic compels application of the demand requirement to actions for return of excessive adviser fees, we briefly discuss the distinctiveness of § 36(b).

Unlike the board in the common variety of derivative suit, the directors have no power to terminate a § 36(b) action. Other provisions of the Investment Company Act, *e.g.*, 15 U.S.C. § 80a–13(a)(3), governed by state rules to the extent they are not inconsistent with federal law, leave unanswered the question whether independent directors of an investment company may terminate suit. *Burks v. Lasker, supra,* 441 U.S. at 483–86, 99 S.Ct. at 1839–1841. "[W]hen Congress ... intend[ed] to prevent board action from cutting off derivative suits, it said so expressly. Section 36(b) ..., added to the Act in 1970, performs precisely this function ...." *Id.* at 484, 99 S.Ct. at 1840 (citation omitted). Since directors cannot cut off a suit and § 36(b) does not authorize them to institute one, and because shareholder plaintiffs are necessarily challenging fees the directors evaluated and approved, 15 U.S.C. § 80a–15; *see Rosenfeld v. Black, supra,* 445 F.2d at 1345, the traditional reason for the demand requirement simply does not apply. *See* Note, *The Demand and Standing Requirements in Stockholder Derivative Actions,* 44 U.Chi.L.Rev. 168, 171–72 (1976).[13]

Moreover, although requiring demand normally imposes only minor hardship on the complaining shareholders, in a § 36(b) suit the consequences can be severe. Section 36(b) expressly limits recovery to excessive fees paid up to one year prior to the commencement of suit. 15 U.S.C. § 80a–35(b)(3). The demand requirement implies a reasonable time in which directors may analyze the issues and determine whether they believe the company has a grievance. The delay caused by this process would, in

---

**12.** We agree with the First Circuit, *Grossman v. Johnson, supra,* 674 F.2d at 121, that debate over the legislative history "end[s] in a draw," but we proceed under a different assumption, that § 36(b) does not permit an action by the investment company, and reach the opposite conclusion that Congress intended no demand requirement would apply.

**13.** One court, analogizing *Burks v. Lasker,* concluded that the question whether a board of directors is sufficiently "interested" in the challenged transaction to excuse demand shall be resolved by reference to "the same factors used to determine whether a court should defer to the board's decision not to pursue the action."

*Lewis v. Curtis, supra,* 671 F.2d at 785. Under this view, the termination and excuse issues are functions of the same indicia of "interestedness." *Burks* may be regarded as recognizing the Congressional determination that directors in § 36(b) actions are *never* sufficiently disinterested to permit them to terminate suit, 441 U.S. at 484, 99 S.Ct. at 1840. Viewing these two principles in tandem, it is possible to infer that Congress also believed directors would always be so "interested" that demand would inevitably be "excused." This is but another way of saying Congress intended that § 36(b) suits would be *exempt* from Rule 23.1.

many cases,[14] have the untoward result of precluding full recovery of excessive fees while the directors determined whether they had acted against the interests of the shareholders in approving the contract initially. We do not believe Congress was unaware of this pitfall.

IV

In a different context, Justice Jackson eloquently described the origin and rationale of the derivative suit:

> Equity came to the relief of the stockholder, who had no standing to bring civil action at law against faithless directors and managers. Equity, however, allowed him to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own. It required him first to demand that the corporation vindicate its own rights, but when, as was usual, those who perpetrated the wrongs also were able to obstruct any remedy, equity would hear and adjudge the corporation's cause through its stockholder with the corporation as a defendant, albeit a rather nominal one. This remedy, born of stockholder helplessness, was long the chief regulator of corporate management and has afforded no small incentive to avoid at least grosser forms of betrayal of stockholders' interests. It is argued, and not without reason, that without it there would be little practical check on such abuses.

*Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949). In holding that a Rule 23.1 demand will not be required in a shareholder suit brought pursuant to § 36(b) of the Investment Company Act, we do not ignore the appropriateness, in the typical derivative suit alleging corporate wrongdoing, of first asking the corporation to "vindicate" what are, after all, "its own rights." We conclude, however, that in the unique context of a § 36(b) lawsuit, the shareholder need not afford the fund an opportunity to vindi-

cate its rights because such a requirement would be an empty, unfruitful and dilatory exercise.

The judgment of the district court is reversed and the case is remanded.

---

**14.** At oral argument, Fox's counsel referred to the case where the fund may have awarded a substantial one-time payment for allegedly re-markable services. No doubt other examples could be cited.