IRWIN MEISELMAN,
Plaintiff,

*vs.*

FERDINAND EBERSTADT, FRANCIS S. WILLIAMS, JULIAN M. AVERY,
PETER B. CANNELL, ALFRED E. DRISCOLL, NELSON LOUD,
LeROY S. MAREK, JAMES J. MINOT, DR. ROGER F. MURRAY,
AUGUSTE RICHARD, F. SCHNEIDER, CRAIG SEVERANCE, MAYNARD
E. SIMOND, HULBERT W. TRIPP, NEWELL B. WALLACE, ERNEST
K. GLADDING, RICHARD W. SEABURY and F. EBERSTADT & CO.,
INC., F. EBERSTADT & CO. and CHEMICAL FUND, INC.,
Defendants.

*New Castle, May 4, 1961.*

*Irving Morris,* of Cohen & Morris, Wilmington, and *Milton Paulson,* New York City, for plaintiff.

*Richard F. Corroon,* Berl, Potter & Anderson, Wilmington, *William Jackson* and *Andrew J. Connick,* of Milbank, Tweed, Hope & Hadley, New York City, for defendant, Chemical Fund, Inc.

*Robert H. Richards, Jr.,* of Richards, Layton & Finger, Wilmington, *Alfred Jaretski, Jr.,* and *Marvin Schwartz,* of Sullivan & Cromwell, New York City, and *John T. Cahill, Robert G. Zeller,* and *Imaneul Kohn,* of Cahill, Gordon, Reindel & Ohl, New York City, for defendants Ferdinand Eberstadt, Francis S. Williams, Peter B. Cannell, Nelson Loud, Craig Severance, F. Eberstadt & Co., and F. Eberstadt & Co., Inc.

*Clair J. Killoran,* of Killoran & Van Brunt, Wilmington, and *Allen T. Klots, Peter H. Kaminer* and *Stephen A. Weiner,* of Winthrop, Stimson, Putnam & Roberts, New York City, for defendants, Julian M. Avery, Alfred E. Driscoll, LeRoy F. Marek, James J. Minot, Roger F. Murray, Auguste Richard, F. Schneider, Maynard E. Simond and Hulbert W. Tripp.

SEITZ, Chancellor: Plaintiff, a stockholder of Chemical Fund, Inc. ("Fund"), brings this derivative action for an accounting on its behalf. The defendants, in addition to the directors of Fund, are F. Eberstadt & Co., Inc. ("Company"), which provides Fund with investment advisory services and acts as principal underwriter and distributor of its shares, and F. Eberstadt and Company ("Investment Company"), an investment banking partnership, whose members own all the stock of Company. The affiliated directors of Fund are partners of the Investment Company.

At the close of the testimony the court granted the motion of the nine non-affiliated directors to dismiss the complaint. The Court did so because it was satisfied that on the basis of the evidence adduced there was no possible liability on their part. Indeed, plaintiff's counsel stated at the close of the evidence that he "could see no real liability on their part". The court reserved the question as to whether it woud decide the issue of the liability of the six affiliated directors and the other defendants except Fund (all called "defendants") without briefs. Because of the limited remaining issue I forego asking for briefs.

Reduced to its final form at trial, plaintiff's claim is that the affiliated directors have, through the management company device, as fiduciaries, paid themselves excessive compensation to the detriment of the Fund and its stockholders. The defendants challenge the merits of plaintiff's claim.

Fund, which has been in existence since about 1938, is an openend diversified investment company registered under the *Investment Company Act of 1940,* 15 *U.S.C.A.* § 80a–1 et seq. It was organized by the defendant Ferdinand Eberstadt and some of his associates. Its assets today are worth approximately $300,000,000. They are

concentrated in companies involved in the chemical process field. Since its creation Fund has had a management agreement ("agreement") with Company whereby Company supplies investment advisory service to it. Fund also pays the Company distribution commissions for its services.

The Investment Company partners are the executives of the Company and are also the principal officers and affiliated directors of Fund.

In 1956 the management fee paid Company was reduced. Under the management agreements which have been in effect since 1956, Company is paid ½ of 1% of the averaged daily net assets of Fund up to $75,000,000, ⅜ of 1% thereof between $75,000,000 and $125,000,000, and ¼ of 1% thereof over $125,000,000. They provide further that there is deducted from such payments the aggregate of the fees paid by Fund to its directors who are not affiliated with Company or the Investment Company. Also, with some exceptions, the agreements require that the expenses of Fund as well as of its own operations are to be paid by the Company.

Plaintiff does not assert, as I understand it, any claim based on the net distribution fees received by Company. Nor does he claim that the rates paid the Company are out of line with those charged in the mutual fund field. Plaintiff says the fees paid by Fund to Company for investment advisory service under the agreements outstanding since November 1956 result in the directors receiving excessive compensation. Thus, plaintiff's contention looks through the "reasonable" payment to the Company and finds that it results in unreasonable compensation to those directors of the Fund who "own" the stock of the Company.

The defendants do not challenge plaintiff's right to rely on the net income of the Company as the basis for his argument. Rather, they meet plaintiff on the merits of his argument.

Plaintiff goes about showing the excessive compensation to the affiliated directors by reconstructing the Company's audits for the years 1956 to 1959 inclusive. He first reduces an indirect expense item to an amount he deems reasonable and then adds (in lieu of the small sum in the audit) his estimate of the reasonable value of the

officers' services which benefited the Fund. Plaintiff says the "net income" after such reconstruction and allowance for income taxes is nothing more nor less than the excess over reasonable compensation paid the affiliated directors. What are the facts?

For the years 1957, 1958 and 1959 plaintiff uses $120,000 as the "correct" allowance for indirect expense while the the Company used $180,000. For 1956, he also uses $120,000 while the Company used $240,000. Next, plaintiff removed a small charge for services of the Investment Company partners appearing in the audit and substituted his calculation of the officers' estimated annual compensation which should be charged against the gross income of the Company. Plaintiff did this by taking the average annual compensation for similar positions in the mutual fund field and apportioning it on the basis of the testimonial estimates by the executives as to the amount of time devoted to Fund business. These amounts come to $391,000 in 1959, $372,000 in 1958, $354,000 in 1957 and $337,000 in 1956. With the exception of the two items mentioned, plaintiff accepted as accurate all the figures appearing in the Company's audits for the pertinent years.

Plaintiff says that net income as adjusted (and possibly after allowance for taxes) is the excess compensation which should be repaid to Fund. This excess, under plaintiff's contention, comes to $306,000 in 1959, $42,000 in 1958, minus $42,000 in 1957 and $194,000 in 1956.

If we use plaintiff's adjusted figures for indirect charges and executive compensation, we find that the "excess compensation" averages about $125,000 per year before federal income taxes for the years 1956 to 1959 inclusive. If we use the indirect charges appearing in the Company audit but employ the plaintiff's total estimated annual salary item as allocated, we find that the average "excess" for the same years is about $50,000 per year before federal income taxes. If we take the indirect charges appearing in the audit and the total estimated annual salaries for the officers rather than the percentages thereof employed by plaintiff in his reconstructed statement, it appears that for the years in question the net profit or, as plaintiff contends, the excessive compensation, would average minus $30,000 per year before taxes.

I have taken the totals on various bases so as to compare and contrast the case from each point of view. It is clear that the real issue is the reasonableness of the amount of estimated compensation shown for the executives. These estimates are based on the average compensation received by comparable executives in the field, presumably for full time work. Can a Court say the average payments must, for present purposes, be directly related, percentage-wise, to the time directly spent on Fund business?

It is very difficult for me to say that the value of the services here rendered by the officers is to be automatically equated with the percentage of time formally devoted to Fund. The nature of their work is such that the service of these executives to the Investment Company was, of necessity, of value to them in discharging their responsibilities to the Company and, through it, to Fund. I say this because their prime commodity is "wise" investment advice. The factors which are relevant to such advice are as manifold as the various political, social and economic problems extant in the world today. Thus, the Investment Company has sources of communication which helps in all phases of the problem of investment analysis.

Recognizing that there must be some limitation on the payment to persons discharging such services, I nevertheless cannot say that compensating these officers in some amount in excess of the industry average as allocated by plaintiff would be legally excessive. The audits for the years 1956 to 1959 inclusive show that the Company's income, apart from the consequences of the two variables discussed, varied radically. There have been good years and bad. Indeed, the year 1960 shows a substantial decline from 1959. These fluctuations indicate that the arrangement is not necessarily a one-way street. To say that the officers are receiving consideration amounting to somewhat more than the average salaries found in the industry, on a time spent basis, is not to say that it is necessarily excessive. There is no shocking disparity as of the 1960 figures. Nor is it wrong, without more, that these fiduciaries desire to take their compensation in such a way that it may be accorded a capital gains treatment.

There was much said to the effect that fiduciaries cannot pay themselves more than the average pay in the industry for similar

services. Fiduciaries, of course, may not pay themselves excessive compensation, but here must be added the fact that the nonaffiliated majority directors, whom plaintiff tacitly admitted he could not prove were dominated by defendants, approved the compensation arrangement yearly with knowledge of the Company's audit. Moreover, the stockholders approved the basic compensation arrangement in 1956 and 1961, albeit they did not know of the Company's "net income" before taxes. Finally, as noted, it appears that the basic charges appearing in the management agreements for the pertinent years are lower than the average in the mutual fund field.

The cumulative effect of the facts compels me to conclude that the difference between what plaintiff admits is reasonable compensation and that actually paid is not "excessive". If the "excess" were divided among the various officers involved in the various years in question, forgetting taxes, I cannot believe it would be considered excessive in the light of the responsibilities involved and the duties performed. Even if the above average performance of the Fund be considered as gilding on the lily, it certainly makes the compensation payments more palatable.

I conclude that plaintiff has failed to prove that the compensation paid for investment advisory service is legally excessive as to any of the years 1956 to 1960 inclusive. The court is not concerned with Fund's future compensation arrangement. In the first instance at least, that will be the responsibility of the non-affiliated directors or stockholders of Fund. It cannot be assumed that they will not discharge their responsibility to make appropriate reviews of the reasonableness of the arrangement from every point of view. Indeed, the same can be said of the defendants, because it was at their instance that the 1956 revision was made.

The complaint will be dismissed on the merits.

Present order on notice.