# DAILY INCOME FUND, INC., ET AL. *v.* FOX

No. 82–1200.   Argued November 7, 1983—Decided January 18, 1984

524

*Daniel A. Pollack* argued the cause for petitioners. With him on the briefs were *Frederick P. Schaffer, George C. Seward,* and *Anthony R. Mansfield.*

*Richard M. Meyer* argued the cause and filed a brief for respondent.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision is whether Rule 23.1 of the Federal Rules of Civil Procedure requires that an investment company security holder first make a demand upon the company's board of directors before bringing an action under §36(b) of the Investment Company Act of 1940 to recover allegedly excessive fees paid by the company to its investment adviser. The Court of Appeals for the Second Circuit

---

*Harvey L. Pitt* filed a brief for the Investment Company Institute as *amicus curiae* urging reversal.

*Solicitor General Lee, Deputy Solicitor General Claiborne, Samuel A. Alito, Jr., Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman, Richard A. Kirby,* and *Myrna Siegel* filed a brief for the Securities and Exchange Commission as *amicus curiae* urging affirmance.

held in this case that the demand requirement of Rule 23.1 does not apply to such actions. *Fox* v. *Reich & Tang, Inc.*, 692 F. 2d 250 (1982). Two other Courts of Appeals have reached a contrary conclusion.[1] We granted certiorari to resolve the conflict, 460 U. S. 1021 (1983), and now affirm.

I

Respondent is a shareholder of petitioner Daily Income Fund, Inc. (Fund), an open-end diversified management investment company, or "mutual fund," regulated by the Investment Company Act of 1940 (ICA or Act), 15 U. S. C. § 80a–1 *et seq.* (1982 ed.). The Fund invests in a portfolio of short-term money market instruments with the aim of achieving high current income while preserving capital. Under a written contract, petitioner Reich & Tang, Inc. (R&T), provides the Fund with investment advice and other management services in exchange for a fee currently set at one-half of one percent of the Fund's net assets. From 1978 to 1981, the Fund experienced substantial growth; its net assets increased from about $75 million to $775 million. During this period, R&T's fee of one-half of one percent of net assets remained the same. Accordingly, annual payments by the Fund to R&T rose from about $375,000 to an estimated $3,875,000 in 1981.

Alleging that these fees were unreasonable, respondent brought this action in the United States District Court for the Southern District of New York, naming both the Fund and R&T as defendants. The complaint alleged that, because the Fund's assets had been continually reinvested in a limited number of instruments, R&T's investment decisions had remained routine and substantially unchanged as the Fund grew. By receiving significantly higher fees for essentially the same services, R&T had, according to respondent, violated the fiduciary duty owed investment companies by

_____

[1] *Weiss* v. *Temporary Investment Fund, Inc.*, 692 F. 2d 928 (CA3 1982), cert. pending, No. 82–1592; *Grossman* v. *Johnson*, 674 F. 2d 115 (CA1), cert. denied, 459 U. S. 838 (1982).

their advisers under § 36(b) of the ICA. Pub. L. 91–547, § 20, 84 Stat. 1428, 15 U. S. C. § 80a–35(b) (1982 ed.).[2] The complaint sought damages in favor of the Fund as well as payment of respondent's costs, expenses, and attorney's fees.

Petitioners moved to dismiss the suit for failure to comply with Federal Rule of Civil Procedure 23.1, which governs "a derivative action brought by one or more shareholders . . . to enforce a right of a corporation . . . , the corporation . . . having failed to enforce a right which may properly be asserted by it . . . ." The Rule requires a shareholder bringing such a suit to set forth "the efforts, if any, made by the plaintiff to obtain the action he desires from the directors . . . , and the reasons for his failure to obtain the action or for not making the effort."[3] Respondent contended that the

---

[2] Section 36(b) of the ICA provides, in relevant part:

"For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person." 15 U. S. C. § 80a–35(b) (1982 ed.).

Section 36(b) goes on to provide, inter alia, that proof of a defendant's misconduct is unnecessary, § 80a–35(b)(1), that approval by the board of directors or shareholders of the adviser's compensation "shall be given such consideration by the court as is deemed appropriate under all the circumstances," § 80a–35(b)(2), and that recovery is limited to actual damages for a period of one year prior to suit, § 80a–35(b)(3).

[3] Rule 23.1 provides in full:

"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1)

Rule 23.1 "demand requirement" does not apply to actions brought under § 36(b) of the ICA and that, in any event, demand was excused because the Fund's directors had participated in the alleged wrongdoing and would be hostile to the suit. The District Court, finding Rule 23.1 applicable to § 36(b) actions and finding no excuse based on the directors' possible self-interest or bias, dismissed the action. *Fox* v. *Reich & Tang, Inc.*, 94 F. R. D. 94 (1982).

The Court of Appeals reversed. *Fox* v. *Reich & Tang, Inc.*, 692 F. 2d 250 (1982). The court concluded that Rule 23.1 by its terms applies only when the corporation could itself "'assert,' in a court, the same action under the same rule of law on which the shareholder plaintiff relies." *Id.*, at 254. Relying on both the language and the legislative history of § 36(b), the court determined that an investment company may not itself sue under that section to recover excessive adviser fees. *Id.*, at 254–261. Accordingly, the court held that Rule 23.1 does not apply to actions by security holders brought under § 36(b). *Id.*, at 261.

## II

Although any action in which a shareholder asserts the rights of a corporation could be characterized as "derivative,"

---

that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would otherwise not have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."

see n. 11, *infra*, Rule 23.1 applies in terms only to a "derivative action brought by one or more shareholders or members to enforce a right of a corporation [when] the corporation [has] *failed to enforce a right which may properly be asserted by it*" (emphasis added). This qualifying language suggests that the type of derivative action governed by the Rule is one in which a shareholder claims a right that could have been, but was not, "asserted" by the corporation in court. The "right" mentioned in the emphasized phrase, which cannot sensibly mean any right without limitation, is most naturally understood as referring to the same right, or at least its substantial equivalent, as the one asserted by the plaintiff shareholder. And, in the context of a rule of judicial procedure, the reference to the corporation's "failure to enforce a right which may properly be asserted by it" obviously presupposes that the right in question could be enforced by the corporation in court.

This interpretation of the Rule is consistent with the understanding we have expressed, in a variety of contexts, of the term "derivative action." In *Hawes* v. *Oakland,* 104 U. S. 450, 460 (1882), for instance, the Court explained that a derivative suit is one "founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff." Similarly, *Cohen* v. *Beneficial Loan Corp.,* 337 U. S. 541, 548 (1949), stated that a derivative action allows a stockholder "to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own"; and the Court added that such a stockholder "brings suit on a cause of action derived from the corporation." *Id.,* at 549. Finally, *Ross* v. *Bernhard,* 396 U. S. 531, 534 (1970), described a derivative action as "a suit to enforce a *corporate* cause of action against officers, directors, and third parties" (emphasis in original) and viewed the question there presented—whether the Seventh Amendment confers a right to a jury in such an action—as the same as

whether the corporation, had it brought the suit itself, would be entitled to a jury. *Id.*, at 538–539. In sum, the term "derivative action," which defines the scope of Rule 23.1, has long been understood to apply only to those actions in which the right claimed by the shareholder is one the corporation could itself have enforced in court. See also *Koster* v. *Lumbermens Mutual Casualty Co.*, 330 U. S. 518, 522 (1947); *Price* v. *Gurney*, 324 U. S. 100, 105 (1945); *Delaware & Hudson Co.* v. *Albany & Susquehanna R. Co.*, 213 U. S. 435, 447 (1909).[4]

The origin and purposes of Rule 23.1 support this understanding of its scope. The Rule's provisions derive from this Court's decision in *Hawes* v. *Oakland, supra.* Prior to *Hawes*, federal courts exercising their equity powers had commonly entertained suits by minority stockholders to enforce corporate rights in circumstances where the corporation had failed to sue on its own behalf. *Id.*, at 452. See *Dodge* v. *Woolsey*, 18 How. 331, 339 (1856); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1821, pp. 296–

---

[4] One commentator has explained that "the derivative suit may be viewed as the consolidation in equity of, on the one hand, a suit by the shareholder against the directors in their official capacity, seeking an affirmative order that they sue the alleged wrongdoers, and, on the other, a suit by the corporation against these wrongdoers." Note, Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit, 73 Harv. L. Rev. 746, 748 (1960). The Court in *Hawes* embraced this conception of the suit as consolidating "two causes of action," 104 U. S., at 452, and referred throughout its opinion to a derivative action as "one in which the right of action [is] in the company," *id.*, at 455; see *id.*, at 457 (cases impose limits on "the right of a stockholder to sue in cases where the corporation is the proper party to bring the suit"). See also *Corbus* v. *Alaska Treadwell Gold Mining Co.*, 187 U. S. 455, 463 (1903) (describing rules governing derivative suits as limiting situations in which "a court of equity may . . . be called upon at the appeal of any single stockholder to compel the directors of the corporation to enforce every right which it may possess, irrespective of other considerations"); Black's Law Dictionary 1272 (5th ed., 1979).

297 (1972). The Court in *Hawes*, while emphasizing the importance of such suits as a means of "protecting the stockholder against the frauds of the governing body of directors or trustees," 104 U. S., at 453, noted that this equitable device was subject to two kinds of potential abuse. First, corporations that were engaged in disputes with citizens of their home State could collude with out-of-state stockholders to obtain diversity jurisdiction in order to litigate the dispute in the federal courts. *Id.*, at 452–453. Second, derivative actions brought by minority stockholders could, if unconstrained, undermine the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders. See *id.*, at 454–457.

To address these problems, the Court in *Hawes* established a number of prerequisites to bringing derivative suits in the federal courts. These requirements were designed to limit the use of the device to situations in which, due to an unjustified failure of the corporation to act for itself, it was appropriate to permit a shareholder "to institute and conduct a litigation which usually belongs to the corporation." *Id.*, at 460. With some additions and changes in wording, the conditions set out in *Hawes* have been carried forward in successive revisions of the federal rules.[5]

---

[5] Shortly after *Hawes* was decided, the Court codified its requirements in Equity Rule 94, which provided:

"Every bill brought by one or more stockholders in a corporation, against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share had devolved on him since by operation of law; and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on

Some of the requirements first announced in *Hawes* were intended to reduce the burden on the federal courts by diverting corporate causes of action "to the State courts, which are their natural, their lawful, and their appropriate forum." *Id.*, at 452–453.[6]  At the same time, however, the Court sought to maintain derivative suits as a limited exception to the usual rule that the proper party to bring a claim on behalf of a corporation is the corporation itself, acting

---

the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action." 104 U. S. ix–x (1882).

In 1912, the Court replaced the original Rule with Equity Rule 27, identical to its predecessor except that it added at the very end the phrase "or the reasons for not making such effort." 226 U. S., Appendix, p. 8. This language was apparently intended to codify a judicially recognized exception to the old Rule in certain circumstances where, in the discretion of the court, a demand may be excused. See *Delaware & Hudson Co.* v. *Albany & Susquehanna R. Co.*, 213 U. S. 435 (1909).

When the Federal Rules were promulgated in 1937, the provisions of Equity Rule 27 were substantially restated in Rule 23(b). See 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.1.15[1], p. 23.1–10 (2d ed. 1982). Finally, in 1966, the present version of new Rule 23.1 was adopted as part of a comprehensive revision of the Rules governing class actions. See *id.*, ¶ 23.1.01, p. 23.1–3.

[6] In particular, the Court required the complaint in a derivative suit to allege that the plaintiff "was a shareholder at the time of the transactions of which he complains, or that his shares have devolved on him since by operation of law, and that the suit is not a collusive one to confer on a court of the United States jurisdiction in a case of which it could otherwise have no cognizance . . . ." 104 U. S., at 461. The second of these requirements was clearly meant to discourage efforts to bring disputes between a company and citizens of the State of incorporation within the diversity jurisdiction of the federal courts. See *supra*, at 530; 3B J. Moore & J. Kennedy, *supra*, ¶ 23.1.15[1], p. 23.1–14. Although the first requirement may also have been intended to discourage contrived diversity suits, see *id.*, ¶ 23.1.15[1], p. 23.1–15, it is now understood as generally "aimed at preventing the federal courts from being used to litigate purchased grievances." 7A C. Wright & A. Miller, Federal Practice and Procedure § 1828, pp. 341–342 (1972).

through its directors or the majority of its shareholders. *Id.*, at 460–461. As the Court later explained, this aspect of the rules governing derivative suits reflects the basic policy that "[w]hether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders." *United Copper Securities Co.* v. *Amalgamated Copper Co.*, 244 U. S. 261, 263 (1917). See also *Corbus* v. *Alaska Treadwell Gold Mining Co.*, 187 U. S. 455, 463 (1903).[7]

The principal means by which the Court in *Hawes* sought to vindicate this policy was, of course, its requirement that a shareholder seek action by the corporation itself before bringing a derivative suit. 104 U. S., at 460–461.[8] This

---

[7] Like the requirements adopted in *Hawes*, the two major features of Rule 23.1 added since that decision—the requirement that the plaintiff "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association" and the provision requiring notice and court approval of settlements—are also intended to prevent shareholders from suing in place of the corporation in circumstances where the action would disserve the legitimate interests of the company or its shareholders. See generally 7A C. Wright & A. Miller, *supra*, §§ 1833 and 1839; 3B J. Moore & J. Kennedy, *supra*, ¶¶ 23.1.16[3] and 23.1.24.

[8] Although the Court in *Hawes* imposed a direct requirement that shareholders make demand on directors before bringing suit, 104 U. S., at 460–461, Rule 23.1 as presently written requires only that a shareholder's "complaint shall also allege with particularity the efforts, *if any*, made by the plaintiff to obtain the action he desires from the directors or comparable authority . . ." (emphasis added). Relying on the emphasized qualification, added to the Rule without comment by the drafters in 1966, see n. 5, *supra*, the Securities and Exchange Commission (SEC), appearing as *amicus curiae*, contends that the Rule does not itself oblige the shareholder to make a demand; instead, it simply requires the plaintiff to plead compliance with applicable obligations of substantive law, ordinarily that of the State of incorporation. See *Burks* v. *Lasker*, 441 U. S. 471, 478 (1979). Because we conclude that a suit brought under § 36(b) of the ICA is not a "derivative action" for purposes of Rule 23.1, see *infra*, at 542, we need not

"demand requirement" affords the directors an opportunity to exercise their reasonable business judgment and "waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. They may regard the expense of enforcing the right or the furtherance of the general business of the corporation in determining whether to waive or insist upon the right." *Corbus* v. *Alaska Treadwell Gold Mining Co.*, *supra*, at 463. On the other hand, if, in the view of the directors, "litigation is appropriate, acceptance of the demand places the resources of the corporation, including its information, personnel, funds, and counsel, behind the suit." Note, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U. Chi. L. Rev. 168, 171–172 (1976) (footnote omitted). Like the Rule in general, therefore, the provisions regarding demand assume a lawsuit that could be controlled by the corporation's board of directors.[9]

In sum, the conceptual basis and purposes of Rule 23.1 confirm what its language suggests: the Rule governs only suits "to enforce a right of a corporation" when the corpora-

---

decide whether the Rule itself, as a matter of federal procedure, makes demand on directors the predicate to a proper derivative suit in federal courts or whether any such obligation must instead be found in applicable substantive law.

[9] Petitioners point out that, even in cases where the corporation could not control the shareholder's lawsuit, a demand on directors affords management an opportunity to pursue nonjudicial remedies for the shareholder's grievance. But however desirable the encouragement of intracorporate remedies may be as a matter of policy, it is not, standing alone, enough to make a suit that the corporation can neither initiate nor terminate a "derivative action" within the meaning of Rule 23.1. Such a suit does not come within the Rule's language as it is most naturally interpreted and as we have consistently understood it. See *supra*, at 527–529. Moreover, the Rule and its predecessors were directed at ensuring that the proper party was before the court in a certain class of cases, see *supra*, at 529–533, and a shareholder action that the corporation cannot control raises no proper party concerns.

tion itself has "failed to enforce a right which may properly be asserted by it" in court.  In this case, therefore, we must decide whether the right asserted by a shareholder suing under § 36(b) of the ICA could be judicially enforced by the investment company.[10]  We turn to consider that question.

## III

In determining whether § 36(b) confers a right that could be judicially enforced by an investment company, we look first, of course, at the language of the statute.  As noted in n. 2, *supra*, § 36(b) imposes a fiduciary duty on an investment company's adviser "with respect to the receipt of compensa-

---

[10] Petitioners contend that, even if an investment company could not bring a suit under § 36(b), a shareholder's action under that section is nevertheless derivative for purposes of Rule 23.1 because the investment company has a similar right to recover excessive fees from its investment adviser under a state-law cause of action for corporate waste.  See, *e. g.*, *Llewellyn* v. *Queen City Dairy, Inc.*, 187 Md. 49, 57–58, 48 A. 2d 322, 326 (1946).  The fact that the corporation may be able to achieve some of the results contemplated by § 36(b) under state law does not, however, demonstrate that a shareholder's action brought under an independent federal statute claims "a right which may properly be asserted" by the corporation.  See *supra*, at 527–529.  The new right created by § 36(b) is not only formally distinct from that asserted in a state claim of corporate waste; it is substantively different as well.  Indeed, an important reason for the enactment of § 36(b) was Congress' belief that the standards applied in corporate waste actions were inadequate to ensure reasonable adviser fees.  As the Senate Committee that reported the bill that became § 36(b) explained: "Under general rules of law, advisory contracts which are ratified by the shareholders, or in some States approved by a vote of the disinterested directors, may not be upset in the courts except upon a showing of 'corporate waste.'  As one court put it, the fee must 'Shock the conscience of the court.'  Such a rule may not be an improper one when the protections of arm's-length bargaining are present.  But in the mutual fund industry where . . . these marketplace forces are not likely to operate as effectively, your committee has decided that the standard of 'corporate waste' is unduly restrictive and recommends that it be changed."  S. Rep. No. 91–184, p. 5 (1969).
See *infra*, at 540, and n. 12.

tion for services" paid by the company and provides that "[a]n action may be brought under this subsection by the [Securities and Exchange] Commission, or by a security holder of such registered investment company on behalf of such company" against the adviser and other affiliated parties. By its terms, then, the unusual cause of action created by § 36(b) differs significantly from those traditionally asserted in shareholder derivative suits. Instead of establishing a corporate action from which a shareholder's right to sue derivatively may be inferred, § 36(b) expressly provides only that the new corporate right it creates may be enforced by the Securities and Exchange Commission (SEC) and security holders of the company.[11]

Petitioners nevertheless contend that an investment company has an implied right of action under § 36(b). In evaluat-

---

[11] Petitioners argue that, because § 36(b) provides for an action "by a security holder of such registered investment company *on behalf of such company*" (emphasis added), such an action is necessarily derivative. In this regard, petitioners rely on this Court's statement in *Burks* v. *Lasker*, 441 U. S., at 477, that a "derivative suit is brought by shareholders to enforce a claim *on behalf of* the corporation" (emphasis added). See also *id.*, at 484 (referring to actions brought under § 36(b) as "derivative"). The fact that derivative suits are brought on behalf of a corporation does not mean, however, that all suits brought on behalf of a corporation are derivative. The "on behalf" language in § 36(b) indicates only that the right asserted by a shareholder suing under the statute is a "right of the corporation"—a proposition confirmed by other aspects of the action: The fiduciary duty imposed on advisers by § 36(b) is owed to the company itself as well as its shareholders and any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff. See S. Rep. No. 91–184, *supra*, at 6; § 36(b)(3). In this respect, a § 36(b) action is undeniably "derivative" in the broad sense of that word. See *supra*, at 527–528. As we have noted, however, Rule 23.1 applies by its terms only to "a derivative action brought by one or more shareholders . . . to enforce a right of a corporation [when] the corporation [has] *failed to enforce a right which may properly be asserted by it*" (emphasis added). The legislative history of § 36(b) makes clear that Congress intended the perhaps unique "right of a corporation" established by § 36(b) to be asserted by the company's security holders and not by the company itself. *Infra*, at 536–541.

ing such a claim, our focus must be on the intent of Congress when it enacted the statute in question. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 377–378 (1982). That intent may in turn be discerned by examining a number of factors, including the legislative history and purposes of the statute, the identity of the class for whose particular benefit the statute was passed, the existence of express statutory remedies adequate to serve the legislative purpose, and the traditional role of the States in affording the relief claimed. *Ibid.; Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13–15 (1981); *California* v. *Sierra Club*, 451 U. S. 287, 292–293 (1981); *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979); *Cort* v. *Ash*, 422 U. S. 66, 78 (1975). In this case, consideration of each of these factors plainly demonstrates that Congress intended the unique right created by § 36(b) to be enforced solely by the SEC and security holders of the investment company.

As we have previously noted, Congress adopted the ICA because of its concern with "the potential for abuse inherent in the structure of investment companies." *Burks* v. *Lasker*, 441 U. S. 471, 480 (1979). Unlike most corporations, an investment company is typically created and managed by a pre-existing external organization known as an investment adviser. *Id.*, at 481. Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the "'relationship between investment advisers and mutual funds is fraught with potential conflicts of interest.'" *Ibid.*, quoting *Galfand* v. *Chestnutt Corp.*, 545 F. 2d 807, 808 (CA2 1976). In order to minimize such conflicts of interest, Congress established a scheme that regulates most transactions between investment companies and their advisers, 15 U. S. C. § 80a–17 (1982 ed.); limits the number of persons affiliated with the adviser who may serve on the fund's board of directors, § 80a–10; and requires that fees for invest-

ment advice and other services be governed by a written contract approved both by the directors and the shareholders of the fund, § 80a–15.

In the years following passage of the Act, investment companies enjoyed enormous growth, prompting a number of studies of the effectiveness of the Act in protecting investors. One such report, commissioned by the SEC, found that investment advisers often charged mutual funds higher fees than those charged the advisers' other clients and further determined that the structure of the industry, even as regulated by the Act, had proved resistant to efforts to moderate adviser compensation. Wharton School Study of Mutual Funds, H. R. Rep. No. 2274, 87th Cong., 2d Sess., 28–30, 34, 66–67 (1962). Specifically, the study concluded that the unaffiliated directors mandated by the Act were "of restricted value as an instrument for providing effective representation of mutual fund shareholders in dealings between the fund and its investment adviser." *Id.*, at 34. A subsequent report, authored by the SEC itself, noted that investment advisers were generally compensated on the basis of a fixed percentage of the fund's assets, rather than on services rendered or actual expenses. Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess., 89 (1966) (hereinafter SEC Report). The Commission determined that, as a fund's assets grew, this form of payment could produce unreasonable fees in light of the economies of scale realized in managing a larger portfolio. *Id.*, at 94, 102. Furthermore, the Commission concluded that lawsuits by security holders challenging the reasonableness of adviser fees had been largely ineffective due to the standards employed by courts to judge the fees. *Id.*, at 132–143. See *infra*, at 540, and n. 12.

In order to remedy this and other perceived inadequacies in the Act, the SEC submitted a series of legislative proposals to Congress that led to the 1970 Amendments to the

Act. Some of the proposals Congress ultimately adopted were intended to make the fund's board of directors more independent of the adviser and to encourage greater scrutiny of adviser contracts. See, *e. g.*, 15 U. S. C. § 80a–10(a) (1982 ed.) (requiring that at least 40% of the directors not be "interested persons," a broader category than the previously identified group of persons "affiliated" with the adviser, see § 80a–2(a)(19)); § 80a–15(c) (requiring independent directors as well as shareholders to approve adviser contracts); *Burks* v. *Lasker, supra,* at 482–483. The SEC had, however, determined that approval of adviser contracts by shareholders and independent directors could not alone provide complete protection of the interests of security holders with respect to adviser compensation. See SEC Report, at 128–131, 144, 146–147. Accordingly, the Commission also proposed amending the Act to require "reasonable" fees. *Id.,* at 143–147. As initially considered by Congress, the bill containing this proposal would have empowered the SEC to bring actions to enforce the reasonableness standard and to intervene in any similar action brought by or on behalf of the company. H. R. 9510, 90th Cong., 1st Sess., § 8(d) (1967); S. 1659, 90th Cong., 1st Sess., § 8(d) (1967).

Representatives of the investment company industry, led by *amicus* Investment Company Institute (ICI), expressed concern that enabling the SEC to enforce the fairness of adviser fees might in essence provide the Commission with ratemaking authority. Accordingly, ICI proposed an alternative to the SEC bill which would have provided that actions to enforce the reasonableness standard "be brought only by the company or a security holder thereof on its behalf." Mutual Fund Legislation of 1967: Hearings on S. 1659 before the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., pt. 1, pp. 100–101 (1967) (hereinafter 1967 Hearings). The version that the Senate finally passed, however, rejected the industry's suggestion that the investment company itself be expressly authorized to bring

suit.  S. 3724, 90th Cong., 2d Sess., § 8(d)(6) (1968).  Instead, the Senate bill required a security holder to make demand on the SEC before bringing suit and provided that, if the Commission refused or failed to bring an action within six months, the security holder could maintain a suit against the adviser in a "derivative" or representative capacity.  *Ibid.* Like the original SEC proposal, however, the Senate bill provided that the SEC could intervene in any action brought by the company or by a security holder on its behalf.  *Id.*, § 22.

After the bill was reintroduced in the 91st Congress, further hearings and consultations with the industry led to the present version of § 36(b).  See S. 2224, 91st Cong., 1st Sess., § 20(b) (1969); 115 Cong. Rec. 13648 (1969) (statement of Sen. McIntyre).  The new version adopted "a different method of testing management compensation."  S. Rep. No. 91–184, p. 5 (1969).  Instead of containing a statutory standard of "reasonableness," the new version imposed a "fiduciary duty" on investment advisers.  *Id.*, at 5–6.  The new bill further provided that "either the SEC or a shareholder may sue in court on a complaint that a mutual fund's management fees involve a breach of fiduciary duty."  *Id.*, at 7.  The reference in the previous bill to the derivative or representative nature of the security holder action was eliminated, as was the earlier provision for intervention by the SEC in actions brought by the investment company itself. See S. 2224, *supra*, § 22.

In short, Congress rejected a proposal that would have expressly made the statutory standard governing adviser fees enforceable by the investment company itself and adopted in its place a provision containing none of the indications in earlier drafts that the company could bring such a suit.  This legislative history strongly suggests that, in adopting § 36(b), Congress did not intend to create an implied right of action in favor of the investment company.

That conclusion is further supported by the purposes of the statute.  As noted above, the SEC proposed the predecessor

to §36(b) because of its concern that the structural require-ments for investment companies imposed by the Act would not alone ensure reasonable adviser fees. See *supra*, at 538. Indeed, the Commission concluded that the Act's provisions for independent directors and approval of adviser contracts had actually frustrated effective challenges to adviser fees. In particular, the Commission noted that in the three fully lit-igated cases in which security holders had attacked such fees under state law, the courts had relied on the approval of ad-viser contracts by security holders or unaffiliated directors to uphold the fees. SEC Report, at 132–143.[12] For this reason, the Senate Report proposing the final version of the statute noted that, while shareholder and directorial ap-proval of the adviser's contract is entitled to serious con-sideration by the court in a §36(b) action, "such considera-tion would not be controlling in determining whether or not the fee encompassed a breach of fiduciary duty." S. Rep. No. 91–184, at 15; see *id.*, at 5. In contrast to its approach in other aspects of the 1970 Amendments, then, Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disin-terestedness of the board. See *Burks* v. *Lasker*, 441 U. S., at 481–482, n. 10, and 484. See also SEC Report, at 146–148 (right of SEC and security holders to bring actions essential; although role of disinterested directors should be enhanced,

---

[12] In the three cases cited by the SEC, the courts had evaluated the adviser contracts according to common-law standards of corporate waste, under which an unreasonable or unfair fee might be approved unless the court deemed it "unconscionable" or "shocking." SEC Report, at 142. See *Acampora* v. *Birkland*, 220 F. Supp. 527, 548–549 (Colo. 1963); *Saxe* v. *Brady*, 40 Del. Ch. 474, 486, 184 A. 2d 602, 610 (1962); *Meiselman* v. *Eberstadt*, 39 Del. Ch. 563, 567–568, 170 A. 2d 720, 723 (1961). Similarly, security holders challenging adviser fees under the ICA itself had been required to prove gross abuse of trust. See *Brown* v. *Bullock*, 194 F. Supp. 207 (SDNY), aff'd, 294 F. 2d 415 (CA2 1961). See 1967 Hearings, at 117–118.

"even a requirement that all of the directors of an externally managed investment company be persons unaffiliated with the company's adviser-underwriter would not be an effective check on advisory fees and other forms of management compensation"). This policy choice strongly indicates that Congress intended security holder and SEC actions under § 36(b), on the one hand, and directorial approval of adviser contracts, on the other, to act as independent checks on excessive fees.

Nor do other factors on which we have relied to identify an implied cause of action support petitioners' claim that the right asserted by a shareholder in a § 36(b) action could be enforced by the investment company. First, investment companies, as well as the investing public, are undoubtedly within "the class for whose *especial* benefit" § 36(b) was enacted, *Cort* v. *Ash*, 422 U. S., at 78 (emphasis in original); see n. 11, *supra*. Section § 36(b)'s express provision for actions by security holders, however, ensures that, even if the company's directors cannot bring an action in the fund's name, the company's rights under the statute can be fully vindicated by plaintiffs authorized to act on its behalf. For this reason, it is unnecessary to infer a right of action in favor of the corporation in order to serve the statute's "broad remedial purposes." Cf. *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 386–387 (1983). See also *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S., at 13–15. Second, because § 36(b) creates an entirely new right, it was obviously not enacted "in a statutory context in which an implied private remedy [had] already been recognized by the courts." Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S., at 378; *Herman & MacLean* v. *Huddleston, supra*, at 384–386. Third, a corporation's rights against its directors or third parties with whom it has contracted are generally governed by state, not federal, law. *Burks* v. *Lasker, supra*, at 478. See *Cort* v. *Ash, supra*, at 78.

## IV

A shareholder derivative action is an exception to the normal rule that the proper party to bring a suit on behalf of a corporation is the corporation itself, acting through its directors or a majority of its shareholders. Accordingly, Rule 23.1, which establishes procedures designed to prevent minority shareholders from abusing this equitable device, is addressed only to situations in which shareholders seek to enforce a right that "may properly be asserted" by the corporation itself. In contrast, as the language of § 36(b) indicates, Congress intended the fiduciary duty imposed on investment advisers by that statute to be enforced solely by security holders of the investment company and the SEC. It would be anomalous, therefore, to apply a Rule intended to prevent a shareholder from improperly suing in place of the corporation to a statute, like § 36(b), conferring a right which the corporation itself cannot enforce. It follows that Rule 23.1 does not apply to an action brought by a shareholder under § 36(b) of the Investment Company Act and that the plaintiff in such a case need not first make a demand upon the fund's directors before bringing suit.

The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE STEVENS, concurring in the judgment.

There are two petitioners in this case, the Mutual Fund and its investment adviser. Even if the former could properly assert an action against the latter under § 36(b) of the Investment Company Act of 1940, 84 Stat. 1428, 15 U. S. C. § 80a–35(b) (1982 ed.)—an action which in turn could be "derivatively" brought by a security holder—in my opinion it would nevertheless remain clear that respondent, as a shareholder of the Fund, could maintain this action without first making a demand on the directors of the Fund to do so.

The rule that sometimes requires a shareholder to make an appropriate demand before commencing a derivative action

has its source in the law that gives rise to the derivative action itself.   Rule 23.1 of the Federal Rules of Civil Procedure merely requires that the complaint in such a case allege the facts that will enable a federal court to decide whether such a demand requirement has been satisfied; Rule 23.1 is not the source of any such requirement.   The plain language of the Rule makes that perfectly clear; the Rule does not require a demand, it only requires that the complaint allege with particularity what demand if any has been made on the corporation.[1]   Moreover, the history of Rule 23.1 and its predecessors, which the Court recites *ante,* at 529–533, demonstrates that the demand requirement was not created by the Rule, but rather by a decision of this Court, *Hawes* v. *Oakland,* 104 U. S. 450 (1882).   When the current Rule's predecessor was promulgated shortly after *Hawes,* it did not create a demand requirement—that had already been done by *Hawes.*   Rather it operated to ensure that the pleadings would be adequate to enable courts to decide whether the applicable demand requirement had been satisfied.   Thus the

---

[1] "In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would otherwise not have.   The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.   The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interest of the shareholders or members similarly situated in enforcing the right of the corporation or association.   The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."   Fed. Rule Civ. Proc. 23.1.

Rule concerns itself solely with the adequacy of the pleadings; it creates no substantive rights.[2]

In this case the respondent fully complied with Rule 23.1. Having made no effort to obtain action from the directors, he simply pleaded that no demand had been made.[3] The question in this case is not whether the complaint complies with the pleading requirements in Rule 23.1.[4] Rather, the ques-

---

[2] This construction of the Rule is consistent with the Rules Enabling Act, which states that the federal "rules shall not abridge, enlarge or modify any substantive right," 28 U. S. C. § 2072. The thrust of petitioners' position, and our prior cases, is that demand requirements enhance the role of managerial prerogatives and expertise by requiring the submission of disputes to management. See *United Copper Securities Co.* v. *Amalgamated Copper Co.*, 244 U. S. 261, 263–264 (1917); *Delaware & Hudson Co.* v. *Albany & Susquehanna R. Co.*, 213 U. S. 435, 446 (1909); *Hawes* v. *Oakland*, 104 U. S. 450, 457 (1882). It cannot be doubted that this type of requirement, designed to improve corporate governance, is one of substantive law. See *Walker* v. *Armco Steel Corp.*, 446 U. S. 740 (1980); Ely, The Irrepressible Myth of Erie, 87 Harv. L. Rev. 693 (1974). Therefore, there is substantial doubt whether the Rule could create such a requirement consistently with the Rules Enabling Act. See *Mississippi Publishing Corp.* v. *Murphree*, 326 U. S. 438, 445–446 (1946); *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 14 (1941). Since the Rule does not clearly create such a substantive requirement by its express terms, it should not be lightly construed to do so and thereby alter substantive rights. See *Hanna* v. *Plumer*, 380 U. S. 460, 470–471 (1965).

[3] Paragraph 14 of respondent's complaint states: "No demand has been made by the plaintiff upon the Fund or its directors to institute or prosecute this action for the reason that no such demand is required under § 36(b) of the Act. Moreover, all of the directors are beholden to R&T for their positions and have participated in the wrongs complained of in this action. Their initiation of an action like the instant one would place the prosecution of this action in the hands of persons hostile to its success." App. 7a–8a.

[4] The Court does not reject this reading of the Rule, but rather leaves the question open. See *ante*, at 532–533, n. 8. In my judgment the Rule and its history are sufficiently clear that the question left open by the Court should be decided, rather than embarking on the more difficult private right of action analysis in which the Court engages. This is all the more justified since, in my view, there could be no demand requirement irrespective of the correct answer to the private right of action question.

tion is whether the federal statute that expressly creates a cause of action that the shareholder may maintain on behalf of the mutual fund implicitly conditions that express right on an unmentioned intracorporate procedural requirement. For two reasons it is clear to me that it does not.

First, the text and legislative history of the statute are inconsistent with a demand requirement. No such condition is mentioned in the statute, and it is a matter of sufficient importance to warrant express mention if Congress had intended it. Instead, the express terms of the statute are inconsistent with such a requirement. A demand requirement is premised upon the usual respect courts accord the managerial prerogatives of directors, see n. 2, *supra;* however, in § 36(b) Congress explicitly rejected the usual rule. As the Court has previously recognized, and acknowledges again today, § 36(b) stands in contrast to the rest of the Act in that unlike its other provisions, § 36(b) limits the usual discretion accorded directors by providing that the directors' position shall be given only "such consideration by the court as is deemed appropriate under all the circumstances." See *ante,* at 539–541; *Burks* v. *Lasker,* 441 U. S. 471, 484 (1979).[5] Congress laid out its own test for consideration of the directors' position in § 36(b), rather than relying on a demand requirement and the usual respect for managerial decision-making which it embodies.

The reason for congressional rejection of the usual deference paid directorial expertise and prerogatives is clear enough. The history of the statute is replete with findings that directors could not be relied upon to control excessive advisory fees. See *ante,* at 537–541; Wharton School Study of Mutual Funds, H. R. Rep. No. 2274, 87th Cong., 2d Sess., 30, 34, 66–67 (1962); Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess., 128–148 (1966);

---

[5] See also S. Rep. No. 91–184, p. 15 (1969).

Hearings on S. 1659 before the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 1193–1200 (1967); S. Rep. No. 91–184, pp. 2, 5–6 (1969). In light of these findings, it cannot be maintained that Congress intended that the very directors who had failed to control excessive fees be involved in the decision whether to challenge those fees.

Moreover, Congress specifically considered the demand issue, in a predecessor version of § 36(b), passed by the Senate in 1968, which required that a security holder make a demand on the Securities and Exchange Commission prior to filing suit. S. 3724, 90th Cong., 2d Sess., § 8(d)(6) (1968). After further consideration this requirement was deleted. Thus, it cannot be said that Congress was unaware of the demand concept, yet it decided not to impose it even with respect to the SEC.

Second, a demand requirement would serve no meaningful purpose and would undermine the efficacy of the statute. As noted above, Congress intended to authorize this type of shareholder action even though the contract between the fund and its investment adviser had been expressly approved by the independent directors of the fund. Since the disinterested directors are required to review and approve all advisory fee contracts under § 15 of the Act, 15 U. S. C. § 80a–15 (1982 ed.), a demand would be a futile gesture after the directors have already passed on the contract. Because the directors may not terminate a suit, see *Burks*, *supra*, at 484, the only effect of a demand requirement would be to delay the commencement of the suit. That in turn would reduce the effectiveness of the Act as a vehicle for protecting investors, since § 36(b)(3) limits recovery to actual damages incurred beginning one year prior to commencement of suit. Thus the demand process would permit investment advisers to keep several months of excessive fees—a consequence squarely at odds with the purposes of the Act and hence congressional intent.

I find nothing in the statute or its history supporting the notion that Congress intended to condition the maintenance of a § 36(b) action on any antecedent intracorporate demand procedure. I would therefore affirm the judgment of the Court of Appeals without reaching the question whether the Fund itself could maintain an action under § 36(b).