UNITED STATES ex rel. Kenneth
MOSAY, et al., Plaintiffs–
Appellants,

v.

BUFFALO BROTHERS MANAGEMENT,
INCORPORATED; Interstate Gaming
Services, Incorporated; Roy C. Palmer;
and Ronald G. Brown, Defendants–Appellees.

No. 93–3193.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1994.

Decided March 31, 1994.

**740**

Michael T. Brody (argued), Deirdre E. Connell, Jenner & Block, Chicago, IL, James E. Townsend, Steven J. Wells (argued), Michael E. Florey, Mark A. Jarboe, Dorsey & Whitney, Minneapolis, MN, for Kenneth Mosay.

Michael T. Brody, Deirdre E. Connell, James E. Townsend, Steven J. Wells, Michael E. Florey, Mark A. Jarboe, Garrison W. Kaufman, Dorsey & Whitney, Minneapolis, MN, for Mary Washington and Archie Mosay.

Jon G. Furlow, James R. Troupis (argued), Michael, Best & Friedrich, Madison, WI, for Buffalo Bros. Management, Inc., Interstate Gaming Services, Inc., Roy C. Palmer and Ronald G. Brown.

Anne Doris Noto, Tara A. Sher, Sonosky, Chambers, Sachse & Endreson, Douglas B.L. Endreson, Washington, DC, Howard Bichler, St. Croix Tribal Council, Hertel, WI, for St. Croix Chippewa Indians of Wisconsin, amicus curiae.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and NORGLE, District Judge.*

POSNER, Chief Judge.

The plaintiffs, three members of the St. Croix Band of Chippewa Indians, appeal from the dismissal on the defendants' motion for summary judgment of their suit to void a contract between the defendants and the St. Croix Band and to recover on behalf of the tribe all the money the defendants have received from the tribe under the contract. The suit was filed in 1992 under 25 U.S.C. § 81, which imposes various requirements on contracts with Indian tribes that involve payment "in consideration of services for ... Indians relative to their lands." The most important requirement is that such contracts be approved by the Bureau of Indian Affairs in the Department of the Interior. The statute authorizes the bringing of suits in the name of the United States to recover all money paid under contracts that violate the statute, with one half of the recovery going to the United States in trust for the tribe and the other half to the person bringing the suit. The statute does not specify who is eligible to bring such a suit—if the statute is read literally, anyone in the world is. Nor does it set forth standards to guide the Bureau of Indian Affairs in deciding whether to approve a contract.

The operation of gambling casinos on Indian reservations is a growing source of income for the tribes. Until 1988 (and perhaps for some period afterward, as we shall see), contracts between the tribes and the firms that actually operate the casinos, like all other contracts with Indian tribes relating to Indian lands (as these casino management contracts were held to be), were required by 25 U.S.C. § 81 to be approved by the Bureau of Indian Affairs. Congress that year enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, which establishes a three-member independent agency within the Department of the Interior—the National Indian Gaming Commission—to supervise Indian gambling. The Act confers on the Commission (or in some instances on the Chairman of the Commission, but we can ignore that complication) comprehensive authority over tribal ordinances or resolutions authorizing gambling and over contracts made by the tribes for the operation or management of their gambling establishments. Of particular relevance to this case, the Commission may not approve management contracts that do not satisfy a number of specific statutory criteria, § 2711; and "management contract"

* Hon. Charles R. Norgle Sr. of the Northern Dis-  trict of Illinois, sitting by designation.

is defined to include "all collateral agreements to such contract that relate to the gaming activity." § 2711(a)(3). The authority heretofore exercised by the Bureau of Indian Affairs under 25 U.S.C. § 81 with regard to Indian gambling contracts "is hereby transferred to the Commission," § 2711(h), which is further authorized to levy and collect civil fines of up to $25,000 for any violations of the Act, regulations issued under it, or tribal ordinances or resolutions approved under it. § 2713(a)(1). In addition the Commission is required to review all management contracts and tribal ordinances and resolutions (relating to gambling) adopted prior to October 17, 1988, the day the Act was passed, and to bring them into conformity with the Act by ordering them modified appropriately. § 2712.

Congress must have anticipated *some* delay in the formation of the new National Indian Gaming Commission, for the Act provides that "until such time as the Commission is organized and prescribes regulations," the Bureau of Indian Affairs "shall continue to exercise those authorities vested in [it] on the day before October 17, 1988." § 2709. But they probably did not anticipate that it would be almost five years before the Commission was up and running. In the interim the St. Croix Band signed two contracts with the defendants. The first was a contract with defendant Interstate to lease slot machines, the second a contract with defendant Buffalo Brothers under which the latter would manage the band's casino, which is located at Turtle Lake, Wisconsin. Both corporations are controlled by the two individual defendants, Palmer and Brown. The management contract was submitted to the Bureau of Indian Affairs, which approved it; whether in doing so the Bureau applied the criteria for approval established by the Indian Gaming Regulatory Act is unclear, although the contract recites that it is being made "pursuant to" that Act and the Bureau official who actually approved it said that his superiors had told him to use the Act's criteria and that he had done so. The other contract, the slot-machine lease, was not submitted to the Bureau because it is not a contract for services "relative to [Indian] lands" as that term has been interpreted in cases under 25 U.S.C. § 81. It does not cede control over Indian lands to Interstate or even (what would be a kind of negative control) forbid the tribe to mortgage its lands. *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 811–12 (7th Cir.1993); *Wisconsin Winnebago Business Committee v. Koberstein*, 762 F.2d 613, 619 (7th Cir.1985); *Barona Group v. American Management & Amusement, Inc.*, 840 F.2d 1394, 1403–04 (9th Cir.1987).

After the approval of the management contract, the casino was built with a substantial investment by Buffalo Brothers and is operating successfully, though the plaintiffs do not believe the tribe is getting its fair share of the profits. They argue that even though the National Indian Gaming Commission was not yet operational when the contracts were signed, the Indian Gaming Regulatory Act was fully applicable to them. The slot-machine lease, being a collateral agreement within the meaning of the Act, should therefore have been submitted to the Bureau of Indian Affairs for approval. They argue that since it was not, the management contract, which was submitted, was incomplete and so should not have been approved. They conclude that both contracts are void and that all the money that the defendants have received under them should be recovered in this suit and divided equally between the United States and the plaintiffs. The tribe itself apparently is content with the contracts. At all events it has dissociated itself from the suit, although the complaint is captioned as being filed "on behalf of the St. Croix Band of Chippewa Indians" and the plaintiffs have assigned in advance any recovery they may obtain in this suit, minus attorney's fees, to the tribe, while the statute itself requires that the share of the recovery going to the United States be held for the use of the tribe. We shall not have to determine whether the contracts are in fact disadvantageous to the tribe.

The principal issue is whether 25 U.S.C. § 81 provides a remedy for violations of the Indian Gaming Regulatory Act, either generally or until the National Indian Gaming Commission went into operation, five years after the Act was passed. But there is

a threshold issue of the plaintiffs' standing. Section 81 is a "qui tam" or, less politely, a bounty hunter's statute: it authorizes any person to sue to declare an Indian contract void and if he succeeds to be rewarded with half the money that the contractor had received under the contract. There is a question, unnecessary to decide in this case, whether Article III of the Constitution permits a federal court to entertain a qui tam suit brought by someone whose only stake in the suit is the bounty. It is one thing for Congress to offer bounties to law enforcers; that is little different from having salaried police and prosecutors. The offer of a bounty as of a salary can create an entitlement upon which a suit in federal court can be based without violation of Article III, *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2143, 119 L.Ed.2d 351 (1992), since one deprived of a statutory right to a bounty has suffered the kind of injury that is a traditional basis for seeking legal redress. It is another thing for Congress to provide that anyone in the United States can sue to enforce the rights of anyone else. For those anyones who are suing to enforce the rights of others are by hypothesis persons who have not been injured themselves, and without an injury to oneself (or to one's members, if one is a membership organization) one has no standing to sue. *Id.*, at —— ——, 112 S.Ct. at 2137–38; *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). There is no standing to sue to redress injuries purely to another. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir.1990).

If the government can be said to own, or hold in trust, the rights that 25 U.S.C. § 81 confers on Indians, then by analogy to qui tam actions under the False Claims Act, most recently *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir.1993), the plaintiff in a qui tam action under section 81, whoever he was, could be thought an assignee of the federal government, rather than an interloper stepping on the toes of the rights holder. Comment, "The Standing of Qui Tam Relators Under the False Claims Act," 57 *U.Chi.L.Rev.* 543, 563–70 (1990); cf. *United States ex rel. Milam v. University of Texas*, 961 F.2d 46, 49 (4th Cir.1992). Until recently, Indians generally were not allowed to sue without the consent or participation of the federal government; and the money recovered in the qui tam suit goes to the United States (and the plaintiff) rather than to the Indians directly. In effect the government's share of the recovery is to be held in trust for the Indians—and a trustee is the one who has the legal right to sue, not the beneficiary—while the plaintiff's share could be thought compensation for generating a fund for the ultimate benefit of the tribe.

▮ We need not try to resolve in this case the general issue of standing in cases under section 81. The plaintiffs in this case are not just anyone. As "enrolled" members of the St. Croix Band they have a legally enforceable right to share in the profits from the use of the tribe's land. That at least is the general rule of tribal Indian law, *Felix S. Cohen's Handbook of Federal Indian Law*, ch. 11 (1982 ed.), and no one questions its applicability to this case. If the plaintiffs are correct that the contracts the band signed with the defendants yield less income to the band than would lawful contracts not marred by what the plaintiffs describe as self-dealing by Messrs. Palmer and Brown, this suit if successful will put money in the plaintiffs' pockets over and above what they would receive from the judgment itself. So they have the kind of stake that will support a traditional lawsuit. The requirements of Article III are satisfied.

▮ There is a distinct question whether the plaintiffs should be authorized to maintain this suit in the teeth of the band's tribal council, of which two of the plaintiffs are former, but not present, members. Functionally this is a derivative suit, in which disgruntled "shareholders" (a pretty exact description of the relation of the tribe's members to the tribe) seek to maintain a suit on behalf of their "corporation" (the tribe) whose "board of directors" (the tribal council) wrongfully refuses to authorize it, against a third party (the defendant contractors).

The general rule is that a derivative suit can be maintained only if the shareholders can show that the board of directors acted wrongfully in refusing to bring the suit. E.g., *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 530–32, 104 S.Ct. 831, 836, 78 L.Ed.2d 645 (1984); *Campfire Land Co. v. Jolin,* 55 Wis.2d 229, 198 N.W.2d 593, 597 (1972); Fed.R.Civ.P. 23.1. Without such a requirement, the shareholders would be able to bypass the board of directors, undermining its authority. In just the same fashion the plaintiffs are trying to undermine the tribal council's authority. For while obviously dissatisfied with the council's decision to stick by the defendants, they have not attempted to show that the decision is not a bona fide business judgment of the council.

■ We leave for a future day the question, not adequately developed by the parties, whether some such requirement should be grafted onto 25 U.S.C. § 81 by judicial interpretation. (We are being deliberately vague. The requirement might well differ from the business judgment rule applied to ordinary corporations, given the paternalistic premise of section 81—that Indians do not have full capacity to make contracts. See Cong.Globe, 41st Cong., 3d Sess. 1484–86 (1871).) We do not think the plaintiffs have a remedy under that statute in any event. When section 81 is read in conjunction with the Indian Gaming Regulatory Act, two distinct, successive regulatory regimes can be seen. One is administered by the Bureau of Indian Affairs under section 81, the other by the National Indian Gaming Commission under the Indian Gaming Regulatory Act. In the first regime, contracts relating to Indian lands, including casino management contracts, must be submitted to the Bureau for approval under criteria undefined by statute or regulation; failure to submit exposes the contractor to the fell sanction of a qui tam suit. In the second regime, a class of contracts—casino management contracts—are carved out of section 81 and subjected to the exclusive regulatory authority of the new Commission administering the new Act, along with certain contracts—contracts collateral to casino management contracts—that never were subject to section 81. 25 U.S.C. § 2711(a)(3); 25 C.F.R. § 502.5. Violations of the Act, including failure to submit contracts required to be submitted to the Commission for approval, subject the violator to civil penalties levied and collected by the Commission in proceedings authorized by the Act.

We doubt that the qui tam provision of section 81 remains applicable to contracts now governed by the Indian Gaming Regulatory Act. Contractors would be subject to enormous legal risk that one of their contracts with an Indian tribe might be held to be a collateral agreement that they should have but failed to file, in which event they would have to repay everything they had received under the contract. Qui tam liability would expand indefinitely at the very moment that Congress had created a new administrative remedy and vested its enforcement in a new, specialized agency with its own detailed, measured, modern set of remedies.

But even if this is wrong, we do not think that qui tam liability for failure to comply with the new statutory standards existed during that period of limbo in which because the new Commission, while formally "established" by the new Act, was not operating, contractors such as the defendants had to submit their proposed contracts to the Bureau of Indian Affairs, the enforcement agency under the old regime. Since section 81 specifies no criteria for the Bureau's approval of contracts within the statute's scope, we suppose the Bureau could if it wanted use the criteria in the new law; and in fact that is what it told its area directors, to whom it delegated the power of approval, to do. But it had no power to do that with regard to the slot-machine lease, which was not within the scope of section 81. We read "shall continue to exercise those authorities vested in" the Bureau on the day before the Indian Gaming Regulatory Act became law until the new Commission was up and running, 25 U.S.C. § 2709, as a direction that the old regime would continue until that happened. That lets out the slot-machine lease, and we are not impressed by the plaintiffs' argument that it comes right back in through the back door on the theory that without the lease before him the area director did not have the full picture and thus could not evaluate the

management contract. The regulation of "collateral agreements" was not within the authority of the Bureau of Indian Affairs under section 81; they are not agreements relating to Indian lands; and so heavy a forfeiture as decreed by section 81 should not be founded on an argument however ingenious that agreements that were not required to be submitted because they did not relate to Indian lands within the meaning of the statute had to be submitted anyway.

█ Although casino management contracts were within the Bureau's authority under the old regime, we do not think the Bureau was required to exercise that authority in accordance with the substantive criteria of the new law. That would have been a recipe for regulatory paralysis. The Bureau of Indian Affairs would have had to equip itself to administer the detailed and comprehensive regulatory scheme for such contracts established by the new Act, and while it was doing so no contracts would be approved. In all likelihood by the time the Bureau was geared up and ready to begin processing applications under the new standards the new Commission would become operational, rendering all the preparatory efforts of the Bureau wasted. In retrospect we know that the investment in gearing up the Bureau to enforce the new statute would not have been completely wasted, because it took five years to organize the Commission; but such a delay could not have been foreseen. And although the Bureau did tell its area directors to apply the criteria of the new Act and in that sense did gear up to enforce it albeit indirectly, that simple directive is all that we have seen. It has not been suggested that the Bureau attempted during the long interim before the new Commission was functional to establish a parallel administrative apparatus or promulgate necessary regulations.

Section 2711 of the Indian Gaming Regulatory Act, which regulates casino management contracts, is addressed to the Commission. It requires the Commission to do this, do that, approve this, approve that, charge contractors a fee to cover the costs of this or that, and so forth. It presupposes a Commission. Realizing that the Commission would not spring magically into existence with the touch of the congressional wand on October 17, 1988, Congress preserved the old system of regulation until such time as the Commission did come into existence. Cf. *Nationwide Building Maintenance, Inc. v. Reich,* 14 F.3d 1102, 1103–04 (6th Cir.1994). Such at all events is our interpretation of section 2709, the interim authority provision. It creates, we acknowledge, an anomaly: while the new Commission is required by section 2712 to reopen all contracts approved under the old regime before the date of the new Act, it is not required to reopen any contracts approved under the old regime between the date of the new Act and the date— five years later—when the Commission was finally up and running. The anomaly is mitigated by the fact that the Commission has adopted a regulation declaring that it reserves the right to reopen those contracts even though not required to do so by the Act. 25 C.F.R. § 533.2. But the validity of the regulation has not been adjudicated.

There is no ideal interpretive solution in this case. The statute is fractured, because it fails to make express provision for the possibility of a long delay in the formation of the regulatory authority. But we think the best—both the truest and the most practical—interpretation is that the regulatory scheme created by the Act did not take effect until the regulatory authority ordained to administer it came into existence. There was not until then a regulatory void; the preexisting regulatory regime, administered by the Bureau of Indian Affairs, remained in effect. The management contract was properly approved in that regime, and the other contract was not subject to the regime at all. As a result, there was no violation of 25 U.S.C. § 81. And the pertinent provisions of the Indian Gaming Regulatory Act, provisions enforceable in our view only by the National Indian Gaming Commission, were not yet in effect because the Commission was not yet in operation; so there was no violation of that statute either. The lawsuit was properly dismissed.

AFFIRMED.