**Keiko ONO, and Altesse Co., Ltd, Plaintiffs,**

**v.**

**Eitario ITOYAMA, Shin Nihon Kanko Kogyo Co., Ltd, and Shinnihon Kanko Kogyo (USA) Co., Inc., Defendants.**

Civ. A. No. 94–1650 (JCL).

United States District Court, D. New Jersey.

April 27, 1995.

Lawrence P. Cohen, Courter, Kobert, Laufer, Purcell & Cohen, Hackettstown, NJ, for plaintiffs.

John J. Barry, Barry & Mc Moran, Newark, NJ, for defendants.

## MEMORANDUM AND ORDER

LIFLAND, District Judge.

This matter comes before the Court on motion by defendants Eitaro Itoyama ("Itoyama"), Shin Nihon Kanko Kogyo Co., Ltd. ("Shin Nihon Japan") and Shinnihon Kanko Kogyo (USA) Co., Inc. ("Shinnihon USA") to dismiss the complaint pursuant to *Fed. R.Civ.P.* 12(b)(6) or for transfer pursuant to 28 *U.S.C.* § 1404(a). Plaintiffs Keiko Ono ("Ono") and Altesse Co., Ltd. ("Altesse") oppose the motion.

### BACKGROUND

This action was commenced by plaintiffs Ono and Altesse on June 28, 1994. Ono is a legal, permanent resident of the United States residing in New York City. (Amended Complaint at ¶ 2.) Altesse is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York City. (¶ 3.) Defendant Itoyama is a Japanese citizen and resident as well as a member of the Japanese House of Representatives. (¶ 4.) Defendant Shin Nihon Japan is a French corporation with its principal place of business in Tokyo. (¶ 5.) Defendant Shinnihon USA is a Delaware corporation with its principal place of business in McAfee, Sussex County, New Jersey. (¶ 6.) The complaint indicates that Ono is president, 50% shareholder and one of two directors of Altesse. (¶ 3.) The complaint also indicates that Itoyama is an officer, 50% shareholder and the other director of Altesse. Itoyama is also an officer, director and controlling shareholder of Shin Nihon Japan and Shinnihon USA. (¶ 5 and 6.)

Plaintiffs allege that Itoyama attempted to ruin Ono and Altesse. Ono was the founder and majority shareholder in Altesse, a business engaged in the import and export of furs and jewelry. Altesse was operating primarily out of a Fifth Avenue boutique. (¶ 10 and 11.) The events giving rise to this action began in 1990 when Itoyama allegedly approached Ono in New York City, requesting her to re-establish the personal relationship they had shared in Japan prior to 1985. (¶ 11.) Itoyama also requested that Ono allow him to invest in Altesse. (¶ 11.)

The complaint alleges that Ono initially refused Itoyama's repeated advances and that she was reluctant to allow Itoyama to invest in Altesse without a long-term commitment. (¶ 12.) According to the complaint, Itoyama offered Ono a long-term business partnership which would "take care of her for life" if she would accept his proposal. (¶ 13.) By September 1990, Itoyama had become a director, officer and fifty percent shareholder of Altesse. (¶ 14.) Around the same time, Ono and Itoyama recommenced their sexual relationship. (¶ 16.)

Plaintiffs allege that around the same time, Itoyama advised Ono that Altesse should abandon its import/export business and, instead, promote a golf course he intended to purchase through Shinnihon USA. (¶ 15.)

Altesse was then transformed into a golf equipment retailer and promotional vehicle for the golf course. According to the complaint, Altesse liquidated its inventory of furs and jewelry, terminated certain employees who were involved in these products, hired employees familiar with golf equipment and golfing events, and remodeled its Fifth Avenue boutique. The cost of the remodeling was borne by Altesse. (¶ 19.) Plaintiffs allege that Ono, having reservations about the change, sought assurances from Itoyama that he and Shinnihon USA would guarantee the salaries of Altesse employees, including that of Ono. According to the complaint, Itoyama, on behalf of himself and Shinnihon USA "promised to pay [these] salaries." (¶ 20.) Thus, the complaint alleges, Altesse and Ono became financially dependent upon Itoyama and Shinnihon USA.

According to the complaint, Itoyama compensated Ono and other Altesse employees for their work for a certain period of time. (¶ 20.) However, during this time, plaintiffs allege that Itoyama began to make "perverse and disgusting" sexual demands of Ono and threatened to stop the payments to her and other Altesse employees when she refused. (¶ 21.) These payments were terminated at the end of 1991. (¶ 23.) However, Itoyama allegedly suggested that Ono could still receive a salary if she complied with his sexual demands. (¶ 24.)

The complaint then alleges that "having succeeded in making Plaintiff Ono and Altesse financially dependent on him, Defendant Itoyama completed the misappropriation of Plaintiffs' assets." (¶ 24.) Itoyama allegedly took over Altesse's lease on the Fifth Avenue boutique; he persuaded Ono to have title to an apartment owned by Altesse, and allegedly worth $2.4 million dollars,[1] transferred to his company Shin Nihon Japan. Ono alleges that "at no time did she understand that she was surrendering her 50% ownership of the [a]partment as a result of [this transfer]." (¶ 25.) Itoyama allegedly promised her she could reside in the apartment as long as she wished. (¶ 25.) Howev-

er, in December of 1993, Itoyama instituted eviction proceedings. (¶ 30.) Ultimately, Ono was forced out of the apartment. (¶ 32.)

In light of the aforementioned allegations, plaintiffs bring this cause of action for fraud, breach of contract, violation of the New Jersey Law Against Discrimination, breach of fiduciary duty, intentional infliction of emotional distress and constructive trust. Defendants now move to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted or, alternatively, to transfer this action.

## DISCUSSION

### Subject Matter Jurisdiction

Defendants argue that the Court should "realign" Altesse as a defendant so that its position reflects its "real interest" in the litigation. If the Court were to so realign Altesse, diversity would be destroyed, requiring dismissal of the entire action, as both Altesse and Ono are New York citizens. Defendants argue, essentially, that an action may not be maintained directly by Altesse against Itoyama. Rather, defendants assert that any claim by Altesse must be brought as a derivative action and that in a derivative action, Altesse should appear as a defendant.

### Choice of Law

The local law of the state of incorporation will be applied "to determine the existence and extent of a director's or officer's liability to its shareholders, in the absence of another state with a more significant relationship." *Tabas v. Mullane*, 608 F.Supp. 759, 764 (D.N.J.1985). *See also Matter of Reading Co.*, 711 F.2d 509, 517 (3d Cir.1983) (claim against corporation evaluated under law of state of incorporation); *Coleman v. Taub*, 638 F.2d 628, 629, n. 1 (3d Cir.1981) (where "internal affairs of corporation," *e.g.*, breach of fiduciary duty of directors and officers, is at issue, right to relief is controlled by law of state of incorporation). Altesse is incorporated under the laws of New York. Both parties argue that New York law applies. Altesse's principal place of

---

1. Plaintiffs also allege that "Ono and/or Altesse spent approximately $400,000 for the renovation and furnishing of this apartment." (¶ 17.)

business is New York. The acts allegedly constituting defendant Itoyama's breach of fiduciary duty to Altesse apparently took place both in New York and New Jersey. At the time of these acts, Itoyama was a resident of New York. Hence, it appears to the Court that New York has the most significant relationship to the allegations relating to the "internal affairs" of Altesse. Accordingly, New York law applies to the issue of whether Altesse must bring its claims in the form of a derivative action.

*Derivative Suits*

■ Defendants argue that Altesse cannot maintain a suit against Itoyama at the initiation of Ono because, although the president of a corporation has presumptive authority to initiate a suit for the corporation, that presumption fails where the president "attempts to sue one who has equal control of the corporation with himself," *Tidy–House Paper Corp. of New York v. Adlman,* 4 A.D.2d 619, 622, 168 N.Y.S.2d 448 (1957). Hence, defendants argue, where the president is a 50% shareholder and sues the other 50% shareholder, the action must be brought derivatively. Indeed, there is ample authority for this proposition. *See, e.g., Executive Leasing Company, Inc. v. Leder,* 191 A.D.2d 199, 200, 594 N.Y.S.2d 217 (1993) ("where there are only two stockholders each with a 50% share, an action cannot be maintained in the name of the corporation by one stockholder against another with an equal interest and degree of control over corporate affairs; the proper remedy is a stockholder's derivative action"); *L.W. Kent and Co., Inc. v. Wolf, et al.,* 143 A.D.2d 813, 533 N.Y.S.2d 119, (1988) (where president and 50% shareholder initiates corporate lawsuit against other 50% shareholder, presumption of president's authority to initiate corporate lawsuit does not apply and appropriate avenue of relief is a derivative action); *Abelow v. Grossman,* 91 A.D.2d 553, 554, 457 N.Y.S.2d 30 (1982) ("action could not be maintained in the name of the corporation, where brought by one stockholder against another with an equal stock interest and degree of control over corporate affairs. The appropriate rem-

edy in such a case is a stockholder's derivative action"); *Tidy–House,* 4 A.D.2d at 621, 168 N.Y.S.2d 448 (presumption of president's authority to initiate corporate lawsuits does not apply "when the president seeks to maintain an action against one who has as much control over the plaintiff corporation as the president himself"; appropriate remedy is a derivative action). The Court notes that this authority is consistent with the admonition of the Court of Appeals in *Sterling Industries, Inc. v. Ball Bearing Pen Corp., et al.,* 298 N.Y. 483, 84 N.E.2d 790 (1949), where the court stated that "One side should not be entitled to maintain an action in the name and at the expense of the corporation simply because the president happens to be allied with its interests." *Id.* at 492, 84 N.E.2d 790.

In response, plaintiffs rely primarily on *West View Hills, Inc. v. Lizau Realty Corp., et al.,* 6 N.Y.2d 344, 189 N.Y.S.2d 863, 160 N.E.2d 622 (1959) where the Court of Appeals held that a corporation could maintain a lawsuit initiated by the president, a minority shareholder, against another corporation and individual defendants who were both majority shareholders in the plaintiff corporation and shareholders in the defendant corporation. Plaintiffs argue that *West View* stands for the extremely broad proposition that the president of a corporation has presumptive authority to initiate a corporate lawsuit absent a direct prohibition by the board or the bylaws, even if the president is a 50% shareholder and the suit is against the other 50% shareholder, who presumably would not consent to such a suit. While *West View* contains broad language, it must be considered in the context of the previous Court of Appeals cases that dealt with similar issues.

The New York Court of Appeals has rendered four decisions on the power of a president to initiate a corporate lawsuit where the board has refused or presumably would refuse permission for such suit. However, only two of these cases deal with suits initiated by a shareholder-president against other shareholders.[2] The first such case decided by the

2. The other two cases, *Rothman & Schneider, Inc. v. Beckerman,* 2 N.Y.2d 493, 161 N.Y.S.2d 118, 141 N.E.2d 610 (1957) and *Matter of Paloma Frocks v. Shamokin Sportswear Corp.,* 3

896

Court of Appeals was *Sterling Industries, Inc., supra.* There, the plaintiff corporation, Sterling, Inc. ("Sterling"), was controlled by "two groups" of individuals, the "Middleman" group and the "Pen Co." group[3], each of which owned 50% of the stock. Two representatives from each group were members of the board of directors. Middleman was president of Sterling and presided over a meeting at which he moved that the company should bring an action against Ball Bearing Pen Corp. ("Pen Co.") for breach of contract and an accounting. The motion was voted on, with two directors for such a lawsuit and two directors against. (The Court of Appeals viewed this deadlock as a refusal.) At the initiation of the president of the corporation, Sterling brought an action against Pen Co., for breach of contract and a second cause of action against certain shareholders of Sterling for inducing Pen Co. to breach the contract.

The question before the Court of Appeals was whether a president of a corporation could institute this action after the board of directors refused permission. The Court held that a president could not initiate such an action and that the appropriate remedy was to bring a derivative suit. Essentially, the Court reasoned that there was no presumptive authority on the part of the president as the board had refused permission. The Court emphasized that § 27 of the New York General Corporation Law, "which provides that the business of a corporation shall be managed by its board of directors, cannot be circumvented" and that to allow the president to bring such an action would be to amend § 27 "to read that the corporation shall be managed by its board of directors, except in the case of deadlock when it shall be managed by any director who happens to be president." *Id.* at 492, 84 N.E.2d 790. The Court also discussed the fact that the litigation did not present an emergency or critical situation that threatened "immediate or vital injury [to] plaintiff." *Id.* at 492, 84 N.E.2d 790. In conclusion, the Court held that a derivative action was the appropriate remedy, for "[o]ne side should not be entitled to maintain an action in the name and at the expense of the corporation simply because the president happens to be allied with its interests." *Id.*

In *West View Hills, Inc. v. Lizau Realty Corp., et al.,* 6 N.Y.2d 344, 189 N.Y.S.2d 863, 160 N.E.2d 622 (1959), the Court addressed the question of whether the president of the plaintiff corporation had the power, as president, to institute an action on behalf of the corporation, where (1) the president had not asked the board for permission to sue, (2) the majority of the board were the owners of the defendant corporation and were defendants themselves as to claims for breach of fiduciary duties to the plaintiff corporation and (3) the individual defendants were also the majority shareholders of the plaintiff corporation, while the president of the plaintiff corporation was a minority shareholder.

In that case, the plaintiff corporation brought claims against the defendant corporation, Lizau Corp., for "wrongfully and improperly requir[ing] [the plaintiff corporation] to pay for work, labor and services" relating to the construction of an apartment building owned and built by Lizau Corp. Claims were also brought against the individ-

---

N.Y.2d 572, 170 N.Y.S.2d 509, 147 N.E.2d 779 (1958), dealt with the power of the president to initiate corporate lawsuits against non-shareholders. In *Rothman,* the court held that the president had presumptive powers to bring such a suit and that "complete strangers to the corporation[,] actually charged with converting a portion of its assets, should not be permitted to question [the acting head of the corporation's] authority and thereby frustrate the action." *Id.* at 499, 161 N.Y.S.2d 118, 141 N.E.2d 610. In *Paloma,* the issue was whether a corporate action could be initiated by the 50% shareholder-president before an arbitration tribunal against a defendant corporation owned and controlled by 50% shareholders of the plaintiff corporation.

The court held the action permissible primarily because a preexisting agreement between the plaintiff corporation and defendant corporation, and authorized by the board of directors of the plaintiff corporation, stated that all disputes between those parties should go to arbitration. Hence, the president's initiation of the arbitration was merely a "routine step" in a process that the board had already approved. *Id.,* 3 N.Y.2d at 575, 170 N.Y.S.2d at 511, 147 N.E.2d at 781. No action or claim was brought against any shareholder.

3. This group consisted of "representatives" of the defendant corporation, Ball Bearing Pen Corp.

ual defendants for breach of their fiduciary duties as directors and officers of the plaintiff corporation. The apartment building in question had been sold and the "said individual defendants had or [were] about to cause the dissolution of Lizau Realty Corp., and to distribute its assets among themselves as the sole remaining stockholders." *Id.* at 347, 189 N.Y.S.2d 863, 160 N.E.2d 622. The Court noted that "[t]he president of West View, under the circumstances, would not have been justified in postponing action until such time as the board had affirmatively authorized commencement of the suit." *Id.*

The Court held that under these circumstances, the president did have the authority to bring such a suit. The Court reasoned that a "corporate entity has independent, separate legal rights. ... Allegedly West View had been charged with and required to pay for construction costs incident to a building in which it had no interest. The coincidence that the plaintiff and defendant corporations were owned by the same individuals who, in turn, constituted the respective boards of directors makes it even more imperative to recognize that West View, as a corporation, has an independent and separate cause of action." *Id.* at 347, 189 N.Y.S.2d 863, 160 N.E.2d 622. The Court distinguished *Sterling* by noting that in that case the board had actually refused to bring the suit (and that therefore any presumptive authority on the part of the president to initiate lawsuits was terminated), whereas in *West View,* the board had taken no action and had, in fact, stipulated that it would take no further action "pending the [court's] determination." *Id.* at 348, 189 N.Y.S.2d 863, 160 N.E.2d 622. The Court concluded as follows:

Absent a provision in the by-laws or action by the board of directors prohibiting the president from defending and instituting suit in the name of and in behalf of the corporation, he must be deemed, in the discharge of his duties, to have presumptive authority to so act. Under these circumstances, the within action was properly instituted by the president in the name of the corporation, in the exercise of his implied authority to protect and preserve the interest of the plaintiff corporation.

*Id.* at 348, 189 N.Y.S.2d 863, 160 N.E.2d 622.

A literal reading of this passage of *West View* would require the board of a corporation to actually refuse to authorize an action before the president's presumptive power can be said to have no force. Plaintiffs point out that certain lower New York courts have accepted this interpretation. For instance, in *Lasker v. Moreida,* 38 Misc.2d 348, 354–55, 238 N.Y.S.2d 16 (1963), the court held that *West View* " 'represents a major advance in corporate concepts and would appear to be the foundation stone for the building of future case law,' " which recognizes that "a corporation, as a separate, legal entity, has the right of economic self-preservation, a right which may be asserted even against a majority of the directors entrusted and empowered with its management when their conduct allegedly constitutes a breach of trust." *See also Cicero Industrial Dev. Corp. v. Roberts,* 63 Misc.2d 565, 312 N.Y.S.2d 893 (1970) (court holding that acting head of corporation may initiate a lawsuit for corporation against persons owning 75% of plaintiff corporation's stock and constituting majority of board of directors; court so held because "[t]here is presumptive power in a president to institute litigation on behalf of the corporation even in situations where he is outnumbered by other shareholders or directors, where the suit is against corporate insiders ... and where no emergency exists"); and *Aircheck v. Felder,* 133 N.Y.S.2d 790 (1954) (permitting 50% shareholder to initiate corporate lawsuit against 50% shareholder for breach of fiduciary duty).[4]

---

4. Plaintiffs also bring other cases to the Court's attention purportedly in support of this broad interpretation of *West View.* However, the Court finds these other cases inapt. *See DiDominici v. Parmet,* 118 A.D.2d 618, 499 N.Y.S.2d 768 (1986) (50% shareholder-director brought a derivative action and did not initiate a lawsuit for the corporation); *Platt Corp. v. Platt,* 21 A.D.2d 116, 249 N.Y.S.2d 75 (1964) (issue was whether a merger affected the merged corporation's right to sue former president and certain directors and officers); *Berma Mgmt. Corp. v. 140 W. 42nd St. Realty, Inc.,* 21 Misc.2d 571, 197 N.Y.S.2d 18 (1960) (majority of shareholders supported action against defendants, who were directors, but no indication that defendants were shareholders of plaintiff corporation); and *Ace Tackless Corp. v. Fuhrman,* 22 Misc.2d 38, 193 N.Y.S.2d 691

The Court does not accept this interpretation of *West View*. While it is clear that the New York Court of Appeals intends that the powers of the president be adequate to protect the interests of the corporation, it is also clear that "the business of a corporation shall be managed by its board of directors [and] cannot be circumvented." *Sterling*, 298 N.Y. at 492, 84 N.E.2d 790. Further, it is also clear that the Court of Appeals was concerned that "[o]ne side should not be entitled to maintain an action in the name and at the expense of the corporation simply because the president happens to be allied with its interests." *Id.* at 492, 84 N.E.2d 790. *West View* did not purport to overrule these basic tenets and concerns.

Although *West View* is written in broad terms, it appears to this Court that the *West View* court simply held that the president's presumptive power to initiate lawsuits for the corporation should be honored in emergent situations absent direct prohibition by the board or by-laws. As noted above, the defendant corporation was about to be dissolved and the proceeds from the sale of the apartment building was about to be distributed to the shareholders. The imminent transfer of the assets was a salient factor to the *West View* court. Indeed, the *Sterling* court did not exclusively rely on the refusal of the board for its decision, but buttressed its decision to prohibit the president from bringing the action by discussing at length the lack of a crisis situation, hence, implicitly recognizing lack of emergent circumstances as a significant factor in its analysis. *See Sterling*, 298 N.Y. at 489, 84 N.E.2d 790.

Plaintiffs argue that Altesse faces such an emergency because Altesse has been "transformed from a successful business to a mere shell with limited means or prospects of conducting a successful business." (Pl.Opp., fn. 6, p. 12). While plaintiffs allege a wrong, the events leading to this alleged wrong took place between 1991 and 1992. The Complaint in this matter was filed April 15, 1994. Plaintiffs do not explain why, if the matter

was as emergent as they allege, such delay in filing this action occurred. The Court notes that plaintiffs do not allege that Altesse has ongoing obligations that will not be met without immediate redress. More importantly, plaintiffs do not allege that the assets of Itoyama will be dissipated or that any of Altesse's rights vis-a-vis Itoyama will be compromised by pursuing a derivative action. Hence, there appears to be no emergent circumstance that would permit the president and 50% shareholder of the corporation to bring this action on behalf of Altesse.

In addition to the above distinction between the present case and *West View*, there are other reasons that *West View* cannot stand for the proposition that a president can initiate a suit for his or her corporation against a 50% shareholder when the board of directors is presumptively against such a suit. Such a broad interpretation would ignore the fact that in *West View*, the board had taken no action and, indeed, had stipulated that they would take no further action on the issue but would await the court's decision. Additionally, this broad interpretation of *West View* would render the bulk of *In re Paloma Frocks* meaningless, a goal that the Court of Appeals did not appear to have. As noted above, fn. 2, pp. 895–96, in that case the issue was whether the president could initiate the arbitration where the board was merely presumptively against the arbitration, *i.e.*, the board had not taken any action. Because the board was presumptively against arbitration, the Court based the president's authority to bring the lawsuit not on presumptive authority, but on a preexisting agreement, authorized by the board, that permitted the president to submit such claims to arbitration as a matter of routine. Hence, the Court concluded that without an overt act of refusal by the board the agreement gave the president the needed authority to bring the matter to arbitration. Hence, it is clear that the *Paloma* Court did not view the president as having adequate au-

(1959) (defendant argued that court had no jurisdiction over the action because action was not authorized by board of directors; court held that this was not a proper ground for attacking jurisdiction and held further that the trial court was

not precluded from determining whether the president of the plaintiff corporation had exceeded his authority in initiating the lawsuit under all of the circumstances).

thority to initiate the action simply because the board had not overtly refused to initiate the action.

It appears to the Court that *Paloma* is consistent with *West View* in the following manner: in each case, the Court of Appeals has required there to be some factor, beyond the inherent power of the president, that favored the exercise of presidential authority where the board presumptively would not authorize a lawsuit. In *Paloma*, the factor was a preexisting agreement; in *West View*, the factor was an emergency situation, where immediate action was necessary to preserve the rights of the corporation. In this case, no additional factor appears to be present. Accordingly, the Court holds that plaintiff Ono does not have presumptive authority to initiate an action for Altesse against Itoyama, the other 50% shareholder. Accordingly, any claims by Altesse must be brought derivatively.

*Realignment of Altesse*

As noted above, defendants argue that because the action on behalf of Altesse may only be brought derivatively, the Court should realign Altesse as a defendant, thus destroying diversity.

*Derivative Suit*

■ In order to bring a derivative suit, a shareholder typically must make a demand on the board of directors of the corporation to bring the suit. *Fed.R.Civ.Proc.* 23.1 [5]; *Lou v. Belzberg*, 728 F.Supp. 1010 (S.D.N.Y. 1990) The rule is founded upon long established policy considerations which recognize that "the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530, 104

S.Ct. 831, 835, 78 L.Ed.2d 645 (1984). However, it is well settled that a court may excuse a failure to make a demand where demand would be futile. *See e.g., Lewis v. Curtis* 671 F.2d 779 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). This is typically done where, as here, a director of the company is alleged to be a wrongdoer. *Wright and Miller,* Federal Practice and Procedure, § 1831, p. 111. *See e.g., Lewis,* 671 F.2d 779. However, that alone does not allow a finding of futility; rather, the court must determine whether the composition and structure of the board of directors is such that the board could not reach an independent decision to pursue or not pursue the claims despite the director-status of the alleged wrongdoer. *Lewis v. Graves,* 701 F.2d 245 (2d Cir.1983); *Lou v. Belzberg,* 728 F.Supp. 1010.

■ Although plaintiffs fail to allege that there was a demand, the complaint, and the preceding discussion, indicates that demand would have been futile. The board consists of the two 50% shareholders. The Court may presume that a 50% shareholder would not agree to initiate litigation against himself. *See, e.g., Tidy–House Paper Corp. of New York v. Adlman,* 4 A.D.2d at 621, 168 N.Y.S.2d 448 ("it could hardly be expected that if approval of the board of directors were sought, [the defendant], who controlled 50% of the board, would have authorized the action against himself"). Accordingly, the complaint alleges the requisites of a derivative action.

*Realignment*

■ It is well established that "diversity jurisdiction cannot be conferred upon the federal courts by the parties' own determination of who are plaintiffs and who are defendants." *City of Indianapolis v. Chase Nat'l*

5. That Rule provides in relevant part as follows: In a derivative action ... the complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort....
For purposes of this discussion, the Court need not reach the question of whether the necessity

of demand upon directors is a matter of federal procedure, governed by federal law, or a matter of the applicable substantive law because the requirements of demand upon directors under Rule 23.1 and New York law are essentially identical. *See Barr v. Wackman*, 36 N.Y.2d 371, 368 N.Y.S.2d 497, 329 N.E.2d 180 (1975) (noting that the demand requirement contained in 6 N.Y.Bus.Corp.Law § 626(c) was enacted on the basis of what is now *Fed.R.Civ.Proc.* 23.1.)

*Bank of City of New York,* 314 U.S. 63, 69, 62 S.Ct. 15, 17, 86 L.Ed. 47 (1941). Instead, the Court must "look beyond the pleadings, and arrange the parties according to their sides in the dispute. Litigation is the pursuit of practical ends, not a game of chess. Whether the necessary collision of interest exists is therefore not to be determined by mechanical rules. It must be ascertained from the principal purpose of the suit and the primary and controlling matter in dispute." *Id.* at 69–70, 62 S.Ct. at 17 (internal quotations and citations omitted).

■ The "general rule" is that the corporation in a derivative suit should be aligned as a plaintiff because the action is brought for the benefit of the corporation and any judgment favorable to the plaintiff shareholder will inure to the benefit of the corporation. However, because federal courts require a "real collision" in interests, *Smith v. Sperling,* 354 U.S. 91, 97, 77 S.Ct. 1112, 1116, 1 L.Ed.2d 1205 (1957), "the final alignment of the parties should reflect the actual antagonisms between the plaintiffs, the corporation, and the directors." *Liddy v. Urbanek,* 707 F.2d 1222, 1224 (11th Cir.1983). Absent collusion, where management refuses to initiate a suit on behalf of the corporation, the requisite antagonism exists. *Smith,* 354 U.S. at 97, 77 S.Ct. at 1116; *Rogers v. Valentine,* 426 F.2d 1361, 1363 (2d Cir.1970); *ZB Holdings, Inc. v. White,* 144 F.R.D. 42, 45 (S.D.N.Y. 1992) (J. Sand). Thus, as a practical matter, where a "plaintiff complies with the demand requirement found in Rule 23.1, the question of alignment should be resolved in favor of treating the corporation as a defendant." Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 7C *Federal Practice and Proc.* § 1822, p. 21. Hence, it appears that absent special circumstances, Altesse should be treated as a defendant.

■ Plaintiffs argue that because Ono and Itoyama are coequal shareholders and directors, management cannot be viewed as sufficiently opposed to the action for purposes of finding that a "real collision" of interests exists. Indeed, there is support for that position. *See Duffey v. Wheeler,* 820 F.2d 1161, 1163 (11th Cir.1987) ("mere inaction, or inability to act on the part of the corporation, because of a deadlock between those who control the corporation has not been found to be the equivalent of active antagonism"); *Liddy,* 707 F.2d 1222 (where plaintiff alleged that he was the majority shareholder and court found that plaintiff was president and "at least" 50% shareholder, corporation was not found to be antagonistic to plaintiff and was realigned as a plaintiff); *Cohen v. Heussinger,* no. 89–6941, 1994 WL 240378 (LEXIS 7119 (S.D.N.Y. May 24, 1994) (stating in *dicta* that where plaintiff does not allege that the defendant controlled the corporation, "management is deadlocked and one faction [*i.e.,* one coequal shareholder] brings suit ... the corporation cannot be viewed as adverse to the plaintiff"); *Gibson v. BoPar Dock Co. Corp.,* 780 F.Supp. 371, 375 (W.D.Va.1991) ("[b]ecause the corporation is unable to act on its own behalf and the shareholders are deadlocked, the corporation cannot be considered antagonistic to plaintiff for purposes of realignment of the parties"). However, the Court notes that determining the real interests of the parties is "a practical not a mechanical determination and is resolved by the pleadings and the *nature of the dispute.*" *Smith,* 354 U.S. at 97, 77 S.Ct. at 1116 (emphasis added). It appears to the Court that plaintiffs argue for a hard and fast rule requiring corporations to be aligned as plaintiffs in all derivative actions brought by coequal shareholders against coequal shareholders. This rule fails to account for the nature of the dispute as required by *Smith, supra.* Moreover, in none of the cases cited above does the plaintiff allege, as here, that the coequal shareholder dominated the corporation through fraud and, in essence, extortionate behavior. As described in more detail above, pp. 893–94, the complaint alleges that once Altesse had been transformed into the marketing arm of Shinnihon USA, Itoyama's own corporation, and had thus become dependent upon Itoyama, Itoyama forced certain transactions through Altesse, such as the transfer of the apartment and relinquishment of the Fifth Avenue lease, which Ono was unable to stop because of her dependence on him. It seems clear that the complaint posits Itoyama as the dominant officer of Altesse and alleges that he gained control of the corporation

through fraud and malfeasance. *Cf. Liddy,* 707 F.2d at 1224 (where the "complaint in a derivative action alleges that the … dominant officials of the corporation are guilty of fraud or malfeasance, then antagonism is clearly evident and the corporation remains a defendant"). Accordingly, the Court finds that Altesse is antagonistic to Ono and will realign Altesse as a defendant. Therefore, diversity is destroyed and the complaint will be dismissed for lack of subject matter jurisdiction.

### Transfer

The Court notes that were it not for the lack of subject matter jurisdiction, this action would have been transferred to the United States District Court for the Southern District of New York. Although one defendant, Shinnihon USA, utilizes New Jersey as its principal place of business, it is clear from the complaint that New York was the site of the majority of the alleged acts from which the claims arose and was the home base of nearly all of the parties involved in this action. Both Ono and Altesse are from New York. During the relevant period, defendant Itoyama was a resident of New York and virtually all of his alleged acts occurred in New York. It appears that Ono and Itoyama will be the principal trial witnesses. Additionally, the properties whose value may be relevant to this dispute, *i.e.,* the $2.4 million apartment and Altesse's Fifth Avenue boutique lease, are located in New York City and witnesses with respect to those properties are likely to be located in New York City. The fact that the principal place of business of Shinnihon USA is in New Jersey appears to have no significance to this dispute.

In view of the Court's disposition of this matter, the remainder of the arguments raised by the defendants need not be addressed.